OPINION OF THE COURT
Marylin G. Diamond, J.
The issue raised by these three related actions is whether the City of New York in its attempt to disperse the present concentration of x-rated businesses in certain areas of the City has violated plaintiffs’ rights of freedom of expression guaranteed under the New York State Constitution.
Plaintiff in Stringfellow’s of N. Y. v City of New York (Stringfellow’s) is an adult entertainment establishment that features topless female dancers. Plaintiffs in Hickerson v City of New York (Hickerson) are Manhattan and Bronx residents who allege they regularly patronize adult entertainment establishments located throughout the City of New York. Plaintiffs in Amsterdam Video v City of New York (Amsterdam Video) are approximately 92 owners and operators of adult establishments. Plaintiffs, in these actions consolidated for the disposition of the underlying motions for summary judgment, seek to have this court declare unconstitutional the text amendment N 950384 ZRY to the Zoning Resolution of the City of New York (the Amended Zoning Resolution) on the ground that it unconstitutionally violates their freedom of expression guaranteed under this State’s Constitution (NY Const, art I, §8).
Prior Proceedings
The Amsterdam Video and Hickerson actions were removed from State court to the United States District Court for the *379 Southern District of New York. The District Court then remanded that portion of the claims arising under the New York State Constitution, holding in abeyance the claims in both actions predicated on the Federal Constitution. The String fellow’s action was commenced in State court.
Upon remand, this court granted Times Square Business Improvement District (TSBID) and the American Alliance for Rights and Responsibilities (AARR) motion to intervene as permissive intervenors. The Appellate Division, First Department, denied Amsterdam Video’s, Hickerson’s and Stringfellow’s motions for a stay and an expedited appeal of that decision.
Background
As of 1965, nine adult entertainment establishments existed in the City of New York. By 1976, the number of such establishments increased to 151. Between 1976 and 1984, the number of adult entertainment establishments declined 13%, from 151 to 131 city wide. In Midtown Manhattan alone, the number of adult uses declined by 48, from 97 to 49. The over-all decline was offset by an increase of 28 adult establishments, from 30 to 58 establishments, in the City’s other four boroughs. Between 1984 and 1993, there was a 35% increase to 177; 107 in Manhattan, 44 in Queens, 15 in Brooklyn, 8 in the Bronx, and 3 in Staten Island.
In response to community concerns regarding the increase in adult establishments and their allegedly adverse impacts upon those communities, the New York City Department of City Planning (DCP) undertook a study in late 1993 (the DCP Study) to determine the nature and extent of the impact that adult establishments have on communities and to assist the New York City Planning Commission (the Planning Commission) in determining whether to amend the City’s Zoning Resolution so as to specifically regulate adult entertainment establishments.
As part of its study, DCP selected seven areas where adult uses are located: Manhattan Community Districts 4, 5, and 7; Bronx Community District 5; Brooklyn Community District 7; Queens Community District 2; and Staten Island Community District 2. DCP did not study the Times Square area because that area was already under study by TSBID (the TSBID Study). DCP also surveyed representatives from community boards, local organizations and businesses, the adult entertainment industry, as well as real estate brokers, and police and *380 sanitation officers in order to compile information concerning the impact of adult entertainment establishments on land use, street conditions, property values, and crime. In addition, the DCP Study considered local studies and surveys such as the Chelsea Business Survey and the TSBID Study. The DCP Study also included a survey and review of adult entertainment studies conducted by other cities such as Islip, New York; Los Angeles, California; Indianapolis, Indiana; Whittier, California; Austin, Texas; Phoenix, Arizona; Manatee County, Florida; New Hanover County, North Carolina; and the State of Minnesota. Also considered were the impacts identified by the City Planning Commission’s 1977 Report, the 1983 Annual Report of the Mayor’s Office of Midtown Enforcement, and the 1993 Task Force on the Regulation of Sex-Related Businesses.
The DCP Study concluded that the number of adult uses citywide has increased substantially in recent years, that a majority of the adult entertainment establishments are located in zoning districts that permit residential developments, and that such establishments as they proliferate tend to concentrate in certain neighborhoods. For example, in Manhattan, adult establishments have clustered in central locations such as Times Square. In the outer boroughs, these establishments have concentrated along major arteries, such as Queens Boulevard in Queens and Third Avenue in Brooklyn. The DCP concluded that the presence of adult entertainment establishments, particularly those that are concentrated in a specific area, tends to produce negative secondary effects such as increased crime, decreased property values, and reduced shopping and commercial activities. Accordingly, the DCP recommended to the Planning Commission that the Zoning Resolution be amended so as to regulate adult entertainment establishments more closely than other commercial uses by placing restrictions on the proximity of adult uses to residential areas, schools, houses of worship, and other adult establishments. Prior to this recommendation, the City’s Zoning Resolution had made no distinction between adult entertainment establishments and other commercial activities.
Pending enactment of amendments to the Zoning Resolution, the Planning Commission approved and the New York City Council adopted an interim amendment to the Zoning Resolution which imposed a one-year moratorium on new or expanded adult entertainment establishments. During the moratorium, no new adult entertainment establishments were allowed and no existing establishment could be enlarged or extended for a *381 period of one year from its effective date of November 24,1994. The moratorium applied to stores featuring adult books, magazines, videotapes, topless or nude bars and adult theaters featuring films, videotapes, or live sex shows.
On March 21, 1995, the DCP and the New York City Council Land Use Committee filed a joint application to amend the Zoning Resolution by proposing permanent regulations that would place restrictions on the location, size and signage of specified types of adult establishments. The objective of the proposed amendments to the Zoning Resolution would be to break the concentration of adult entertainment establishments in certain neighborhoods by dispersing such businesses to certain permissible zoned districts. Following extended public hearings, comments and recommendations on the proposed regulations, the City Council approved the Amended Zoning Resolution on October 25, 1995, effective on that date.
The Amended Zoning Resolution
The centerpiece of the Amended Zoning Resolution is a set of locational restrictions and anticoncentration provisions that are designed to shield the City’s residential neighborhoods, and the facilities and commercial areas that serve them, from the negative impacts produced by adult uses. Even before the regulations were adopted, the general regulatory scheme embodied in the Zoning Resolution prohibited new commercial development in the City’s residentially zoned districts. Under the Amended Zoning Resolution, adult uses are also barred from certain districts that are zoned for commercial and manufacturing uses, but, in addition, permit new residential development (Amended Zoning Resolution § 32-01 [a]; § 42-01 [a]). Many of these districts are mapped within residential districts and contain the local retail strips that serve the everyday commercial needs of the surrounding residential neighborhoods. Adult uses continue to be allowed, subject to certain restrictions, in a number of commercial and manufacturing districts that are mapped throughout the City and in which a variety of retail, entertainment and other commercial uses are permissible (Amended Zoning Resolution § 32-01 [b]; § 42-01 [b]).
In the districts in which adult establishments are permitted, certain restrictions are imposed to further ensure that such uses do not adversely impact residential communities or the facilities that serve them. In these districts, adult establishments must be located at least 500 feet from any school, day *382 care center, or house of worship and at least 500 feet from most zoning districts in which new residential uses are allowed (Amended Zoning Resolution § 32-01 [a]; § 42-01 [b]).
The Amended Zoning Resolution also contains several provisions designed to prevent the concentration of adult uses. In the districts in which adult entertainment are permitted, a new adult use must be located at least 500 feet from any other adult use (Amended Zoning Resolution § 32-01 [c]; § 42-01 [c]). Moreover, only one adult establishment, not to exceed 10,000 square feet of usable floor area, may be located on a zoning lot (Amended Zoning Resolution § 32-01 [d], [e]; § 42-01 [d], [e]). The Amended Zoning Resolution also regulates the size, placement and illumination of accessory business signs on adult establishments, but not their content (Amended Zoning Resolution §§ 32-69, 42-55).
The Amended Zoning Resolution subjects existing adult establishments that do not conform to the restrictions contained therein to the amortization provisions which require them to come into conformity or terminate within one year of the amendment’s effective date of October 25, 1995 (Amended Zoning Resolution §§ 52-734, 52-77). The Amended Zoning Resolution further provides that upon application of the owner of a nonconforming adult establishment the Board of Standards and Appeals may allow a nonconforming establishment to be maintained for more than one year from the effective date of the regulations. In order to grant such an extension, the Board must find that the applicant has made substantial expenditures related to the nonconformity, which the applicant has been unable to recover by the prescribed one-year deadline, and that the extension is the minimum necessary to enable the applicant to recover those expenditures (Amended Zoning Resolution § 72-40).
The Amended Zoning Resolution provides for a limited exemption for adult establishments existing as of October 25, 1995 (Amended Zoning Resolution § 32-01 [f]; § 42-01 M). These establishments that are not located in the prohibited districts and are otherwise conforming except that they are within 500 feet of another adult use, located on the same zoning lot of another adult use, or exceed 10,000 square feet of usable floor area, would not be subject to the amortization provisions of section 52-77.
Discussion
Analysis begins with a review of two separate and competing principles implicated in these actions: freedom of expression *383 and governmental zoning powers. Article I, § 8 of the New York State Constitution provides in relevant part: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.” This State’s highest Court has ruled that New York’s constitutional guarantee of freedom of expression affords greater protection than its Federal counterpart (People ex rel. Arcara v Cloud Books, 68 NY2d 553, 557 [1986]). In so ruling, the Court of Appeals emphasized that "New York has a long history and tradition of fostering freedom of expression, often tolerating and supporting works which in other States would be found offensive to the community” (supra).
With regard to zoning, the Court of Appeals has recognized that municipalities have broad powers to implement land use controls to meet the increasing encroachments of urbanization on the quality of life (Matter of Town of Islip v Caviglia, 73 NY2d 544, 550 [1989]; Asian Ams. for Equality v Koch, 72 NY2d 121, 128-129 [1988]; Matter of Harbison v City of Buffalo, 4 NY2d 553, 559 [1958]). Restrictions on real property use and development are justified as a proper exercise of a municipality’s police power to advance the public health, safety and welfare (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 550, citing Berman v Parker, 348 US 26, 32 [1954], and Udell v Haas, 21 NY2d 463, 469-470 [1968]).
Preventing neighborhood deterioration is undeniably a legitimate public objective. (See, Berman v Parker, 348 US, supra, at 32-33.) Without stable residential and commercial neighborhoods large sections of a modern city can quickly deteriorate into an urban jungle with tragic consequences to social, environmental and economic values (Young v American Mini Theatres, 427 US 50, 80 [1976] [Powell, J., concurring]). Zoning when used to preserve the character of specific areas of a city is " 'the most essential function performed by local government, for it is one of the primary means by which we protect that sometimes difficult to define concept of quality of life.’ ” (Supra.)
Zoning ordinances are legislative acts that enjoy a strong presumption of constitutionality and if there is a reasonable relation between the end sought to be achieved and the means adopted to achieve that end the regulation will be upheld (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 550-551, citing Asian Ams. for Equality v Koch, 72 NY2d, supra, at 132; McMinn v Town of Oyster Bay, 66 NY2d 544, 549 [1985], and *384 Shepard v Village of Skaneateles, 300 NY 115, 118 [1949]). Where the issue is "fairly debatable” courts must defer to the legislative judgment on the need for such regulation (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 551).
An unavoidable constitutional tension is created, however, when a municipality’s zoning power is used to regulate lawfully operating establishments that are devoted to adult uses protected under this State’s constitutional guarantee of freedom of expression (see, Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 551). It is against this framework that this court must determine whether the Amended Zoning Resolution violates plaintiffs’ freedom of expression.
The parties agree that the Court of Appeals decision in Islip (supra) is dispositive of the constitutional issues raised herein. They differ on its application to the instant case. In Islip, the Town of Islip sought to enjoin the continued operation of an adult bookstore in a restricted zone on the grounds that its operation was in violation of the Town’s restrictive zoning ordinance applicable to adult uses. On appeal to the Court of Appeals, the restrictive zoning ordinance was found to be content-neutral because it was enacted to prevent the deterioration of neighborhoods, and, as such, was upheld as a valid exercise of governmental police power.
The test as articulated by the Islip Court to determine whether a zoning ordinance, such as the Amended Zoning Resolution, is constitutional under the State’s Constitution is as follows: (1) the ordinance must be justified by concerns unrelated to speech; and (2) it must be "no broader than necessary” to achieve its purpose (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 558-559, citing People ex rel. Arcara v Cloud Books, 68 NY2d 553, supra). Although the first prong of this two-prong test is not labeled as such, it is essentially the same type of inquiry as the "predominant purpose / secondary effects” test enunciated by the United States Supreme Court in Renton v Playtime Theatres (475 US 41 [1986]) in analyzing restrictive zoning regulations in the context of the First Amendment (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 551, 557-558). In his dissent, Associate Judge Titone observed, without comment from the majority, that the majority’s "reliance on the purpose of Islip’s ordinance is remarkably similar to the 'predominant purpose’ test espoused in Renton v Playtime Theatres”, and reasoned that "[although the majority does not explicitly adopt or apply the 'predominant purpose’ test, in the absence of some other clearly articulated principle, *385 the majority opinion must be read as an incorporation of the 'predominant purpose’ test into the framework of our State’s freedom of speech jurisprudence” (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 570 [Titone, J., dissenting]). The Islip Court also recognized that Renton requires as another component of the two-prong test that a restrictive zoning ordinance, such as the Amended Zoning Resolution, provide alternative locations for adult use businesses (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 554-555).
In challenging the constitutionality of the Amended Zoning Resolution, plaintiffs contend that since its language bans the distribution or exhibition of nonobscene adult entertainment, a form of protected speech, in designated areas of the City, it is a content-based regulation that purposefully regulates speech. As such, plaintiffs contend that the Amended Zoning Resolution is presumptively invalid. The City, TSBID and AARR argue that the Amended Zoning Resolution is not content-based, but content-neutral under Islip (supra) and Renton (supra).
Whether the Amended Zoning Resolution is content-based or content-neutral is of no import. The compelling State interest analysis applicable to content-based regulations involves the same inquiry needed in determining whether the Amended Zoning Resolution is content-neutral; that is whether it was justified by concerns based on adverse secondary effects, rather than speech. In fact, in analyzing Islip’s zoning ordinance as a content-based regulation, Associate Judge Titone noted in his dissent, without comment from the majority, that "[w]hile there can be no doubt that a municipality has an interest in 'the stability and revitalization of the neighborhoods’ * * * this interest cannot be considered 'compelling’ without at least some showing that the form of expression to be regulated has an actual and specific deleterious effect on the community” (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 567). The critical question then becomes whether the enactment of the Amended Zoning Resolution was a purposeful attempt to regulate speech or an attempt to address the alleged adverse secondary effects caused by the proliferation of adult establishments.
Plaintiffs contend that the Amended Zoning Resolution is constitutionally infirm because the City has failed to demonstrate the existence of adverse secondary effects. They criticize the City’s reliance on other studies conducted nationwide and locally. Specifically, they argue that the DCP Study and other *386 studies on adverse secondary effects considered by the Planning Commission and the testimonial evidence during the public hearings held before the City Council are unreliable since they were not based on empirical or documented data, but rather anecdotal and inconclusive evidence. The Amsterdam Video and Hickerson plaintiffs point to the report prepared by their expert, R. Bruce McLaughlin (McLaughlin), a land-use planning and local government consultant based in Florida, for support. McLaughlin concludes, even though he did not perform his own independent study, that he does not believe that any existing study has demonstrated that adverse secondary effects have resulted from the presence of adult establishments. He also disagrees with zoning studies used in Indianapolis, Los Angeles, Phoenix and Austin among others. Most telling is his attack upon the Islip Study, about which he says: "In my professional opinion, based on the reviews and analyses described above, and on my professional training and experience, there is nothing in the Islip Study that documents the alleged adverse secondary effects of Adult Uses in general, supports the 'legislative findings’ of the Ordinance, or provides information upon which a reasonable and prudent planner or local government official could reasonably believe or rely upon in the regulation of adult entertainment establishments.” (McLaughlin affidavit ^ 171.) This is the very same study which the New York Court of Appeals characterized as follows: "The ordinance was prepared after thorough study of the community by professional planners and municipal officials. The Report on which it was based recognized the competing concerns in its first paragraph when it stated that: 'This report studies the effects of adult entertainment or sex businesses on surrounding uses, both residential and commercial. * * * Materials or entertainment opportunities offered at these businesses are not a concern of this report.’ The research and data underlying the Report supported its conclusion that the presence of such uses had a deleterious effect on the quality of life in the communities of the Town and the ordinance which followed was adopted in conjunction with a comprehensive plan for the development of the Town as a whole” (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 552).
In Renton (supra), the United States Supreme Court held that a municipality is entitled to rely on the experiences of other cities concerning adverse secondary impacts in enacting a zoning ordinance regulating adult use businesses (Renton v Playtime Theatres, 475 US, supra, at 51). The Supreme Court *387 further held that: "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses” (supra, at 51-52 [emphasis added]). In recognizing the legitimacy of this analysis, our Court of Appeals observed that "planning studies, by their nature, are not scientific nor their predictions certain but [a municipality is] entitled to credit the evidence in its study of past deterioration and the prediction that, unless remedied, the deterioration would continue; it [is] not required to wait before acting until its business areas [become] wastelands” (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 553-554). The Court of Appeals also recognized that "planning studies have established that adult bookstores and other adult entertainment facilities are generally injurious to the maintenance and development of healthy commercial and residential areas” (supra at 551). Thus, the City’s methodology in determining whether adult establishments existing in the City produced negative impacts was constitutionally permissible. Nor was the City, as plaintiffs, particularly Stringfellow’s (supra), contend, required by Islip or Renton to conduct an independent assessment of every adult establishment to determine whether these particular places caused any adverse secondary impacts. All that is constitutionally required is that there is a reasonable belief that adult entertainment businesses, including the upscale kind allegedly offered by Stringfellow’s, produce at least some of the unwanted secondary effects so as to permit the City to experiment with solutions to admittedly serious problems (ILQ Invs. v City of Rochester, 25 F3d 1413, 1418 [8th Cir 1994], cert denied 513 US 1017, citing and quoting Young v American Mini Theatres, 427 US 50, supra).
Based on the foregoing, the City was permitted to rely on the DCP Study, as well as other studies, to determine whether adult use businesses produce adverse secondary effects.
The DCP Study was undertaken in response to growing concerns that adult establishments were proliferating in New York City and concentrating in areas where such establishments had previously not located, causing negative effects on surrounding communities. DCP also considered the study prepared by the TSBID concerning the location and concentration of adult use businesses in the Times Square area which concluded that some adult establishments could exist in the *388 Times Square area, but their growing number and their concentration on Eighth Avenue constitute a threat to commercial prosperity and residential stability.
Also considered was the Chelsea Business Survey which showed that a large majority of the commercial tenants in the area reported a negative impact on the economic vitality of their businesses stemming from the proximity of adult use businesses. An even larger percentage of those surveyed held the belief that the concentration of adult establishments has resulted in a declining potential for doing business in Chelsea. The DCP also considered studies prepared by other States. Those studies essentially concluded that adult entertainment establishments have negative secondary impacts such as increased crime rates, depreciation of property values and deterioration of community character and the over-all quality of urban life. Although there was testimony in opposition to the amendments to the zoning resolution, the great preponderance of such opposition was that the proposals were not restrictive enough and that adult uses should be prohibited in more areas of the City.
The voluminous and comprehensive administrative record clearly demonstrates the City not only reviewed studies from other jurisdictions, but actually used those studies to guide it in its study to determine the existence of negative secondary effects associated with adult use businesses, and in formulating a proper response to combat such effects. Based on this record the City Council was justified in finding that the present configuration of adult use establishments causes adverse secondary effects, a finding which demonstrates that the Amended Zoning Resolution was based on a compelling State interest related to combating such negative effects, rather than restricting speech. As such, the finding is entitled to deference by this court (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 550-551). It is noteworthy that there are similar characteristics in the City’s Amended Zoning Resolution with other cities’ zoning ordinances regulating adult uses, and significantly that some of those ordinances are more restrictive than the Amended Zoning Resolution (see, e.g., Detroit, Michigan [1,000-foot buffer zone]; Islip, New York [permissible in industrial zone only]; Renton, Washington [1,000-foot buffer zone]; Seattle, Washington [confined to commercial areas]).
 Plaintiffs contend that the Amended Zoning Resolution is broader than necessary, and, as such, is unconstitutional. This contention is unavailing. The Islip Court has held that a *389 municipality may utilize its zoning powers to address the negative effects associated with adult use businesses given the fact that such effects are not subject to direct attack (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 559). The Court deemed this approach as the "most appropriate” response to addressing the existing problems. Under these circumstances, the Amended Zoning Resolution is no broader than necessary, and does not violate the State Constitution.*
The last requirement that the Amended Zoning Resolution must meet to pass constitutional muster is whether it allows for "reasonable alternative avenues of communication” (Renton v Playtime Theatres, 475 US, supra, at 50). The New York standard enunciated by the Islip Court is virtually identical — whether or not "there remains ample space available for adult uses” (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 555).
In support of its contention that "there remains ample space available for adult uses”, the City submitted affidavits by Joseph B. Rose, Chairman of the New York City Planning Commission and Director of the DCP, William Bernstein, the First Deputy Executive Director of the DCP, and Andrew S. Lynn, Executive Director of the DCP.
*390 The record establishes that the Amended Zoning Resolution permits adult establishments in a number of commercial and manufacturing districts and in all of the City’s five boroughs. The total available land area in which adult establishments are permitted is almost 4% of the City’s total land area. Adult establishments are allowed in districts which are also zoned to permit retail, recreational, entertainment and commercial uses.
Bernstein claims in his affidavit that the Amended Zoning Resolution does not unduly restrict adult uses to "limited or unsuitable” areas of the City (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 559). To refute plaintiffs’ claim that Amended Zoning Resolution is unduly restrictive, Bernstein analyzes five paradigm areas, one from each borough, where adult establishments presently exist and which will permit adult establishments under the Amended Zoning Resolution.
Bernstein’s analysis of the impact of the Amended Zoning Resolution on Manhattan is especially compelling. Bernstein examines the six Manhattan community districts below 59th Street which presently contain 100 adult establishments, the majority of the City’s adult businesses. In the area below 59th Street, undisputably a world-class business, retailing and entertainment center, it is calculated that 19 existing adult establishments may remain and that there are approximately 78 potential sites for relocation in this area. Under the new regulations, adult uses are permitted between 26th and 55th Streets from Fifth Avenue to Eighth Avenue, although it is acknowledged that few adult uses will be permitted between 34th and 49th Streets because there are a large number of schools and houses of worship located there which require 500-foot separation zones. However, the area between 49th and 55th Streets is a major tourist area containing a large number of hotels and theaters and the area between 26th and 33rd Streets abuts Herald Square, a major retail center. Adult uses are also permitted on the far west side of Manhattan between 12th and 57th Streets. The southern portion of this area is adjacent to Greenwich Village and the Chelsea area. This area contains the Jacob K. Javits Convention Center, tourist attractions such as the Intrepid Air and Space Museum, and the Circle Line Terminal, as well as other retail and commercial establishments, transportation facilities, parking lots, health clubs, restaurants, art galleries, studios, warehouses, trucking facilities, automobile showrooms, and film production facilities. The Chelsea Piers Sports and Entertainment Complex, a large *391 and expensive entertainment facility, recently opened in this area. Adult uses are also permitted on several block fronts on Eighth Avenue just south of Times Square, in southwest Greenwich Village between Clarkson and Spring Streets along Greenwich and Hudson Streets as well as several small areas of lower Manhattan. This specific analysis belies plaintiffs’ bald allegation that Manhattan-oriented patrons of adult establishments will be required to travel to the outer boroughs.
The Bernstein affidavit also details the proximity to transportation which characterizes the five paradigm areas. It reveals that all of the Manhattan permissible districts and 80% of the permissible districts in the outer boroughs are within a 10-minute walk from mass transportation such as subways or buses. The permissible districts are also adjacent to or relatively near major roadways. Many, such as the west side of Manhattan, are convenient to bridge and tunnel crossings. The Staten Island paradigm district is linked by bus to the Staten Island Ferry.
Another significant factor considered by the City is the availability of relocation sites for existing adult establishments required to relocate under the Amended Zoning Resolution. During the enactment process, the City calculated that a total of approximately 500 adult establishments will be able to operate in the new adult zones. The DCP calculation was done by factoring in the 500-foot separation provisions in the Amended Zoning Resolution and by excluding certain properties unlikely to be developed for commercial use such as airports, properties occupied by public utilities, oil storage facilities, large tracts of publicly owned property and wetlands. The City argues that 500 potential sites should more than adequately cover the 147 businesses which must relocate.
The City also points out that very few currently operating adult establishments are as large as the 10,000 square foot useable floor area size permitted under the Amended Zoning Resolution. They also point out that the amendments do not restrict establishments which sell or display limited amounts of adult material often found at general purpose book and video stores and newsstands. They also argue that the amendments permit all the existing adult establishments to continue to operate and also permit an expansion in terms of numbers and size of establishments.
Plaintiffs argue that the amendments relegate adult establishments to remote and inaccessible areas of the City and that, after excluding sites which are not part of the relevant *392 real estate or commercial marketplace, there is not an adequate number of potential relocation sites for those adult establishments required to relocate under the Amended Zoning Resolution. In support of their arguments plaintiffs principally rely upon McLaughlin’s affidavit.
McLaughlin concludes that "the number of sites truly available is inadequate to accommodate the adult uses required to relocate under the Amended Zoning Resolution”. (McLaughlin affidavit 49.) He arrives at his conclusion by the same methodology (a process of elimination of sites based upon factors which he claims makes certain sites unavailable) which was adopted by the United States Court of Appeals for the Ninth Circuit in Playtime Theatres v City of Renton (748 F2d 527, 534 [9th Cir 1984]) and specifically rejected by the Supreme Court in its reversal of that decision.
"Finally, turning to the question whether the Renton ordinance allows for reasonable alternative avenues of communication, we note that the ordinance leaves some 520 acres, or more than five percent of the entire land area of Renton, open to use as adult theater sites. The District Court found, and the Court of Appeals did not dispute the finding, that the 520 acres of land consists of '[a]mple, accessible real estate,’ including 'acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is criss-crossed by freeways, highways, and roads.’ * * *
"Respondents argue, however, that some of the land in question is already occupied by existing businesses, that 'practically none’ of the undeveloped land is currently for sale or lease, and that in general there are no 'commercially viable’ adult theater sites within the 520 acres left open by the Renton ordinance * * * The Court of Appeals accepted these arguments, concluded that the 520 acres was not truly 'available’ land, and therefore held that the Renton ordinance 'would result in a substantial restriction’ on speech * * *
"We disagree with both the reasoning and the conclusion of the Court of Appeals. That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have 'the effect of suppressing, or greatly restricting access to, lawful speech,’ * * * we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, *393 will be able to obtain sites at bargain prices * * * In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement” (Renton v Playtime Theatres, 475 US, supra, at 53-54).
Based on the foregoing, McLaughlin’s methodology is fatally flawed inasmuch as his analysis depends on factors which he claims must exist for it to be suitable for "some generic commercial enterprise”. Included in these factors are criteria which courts have consistently rejected. For example, McLaughlin cites the use of industrial areas as one factor in his analysis despite the fact that the Islip zoning resolution limited the establishment of adult uses exclusively to an industrially zoned district (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 555; see also, County of Cook v Renaissance Arcade & Bookstore, 122 Ill 2d 123, 522 NE2d 73, 79 [1988], appeal dismissed sub nom. Mannheim Books v County of Cook, 488 US 882 [1988]). His process of elimination also uses such factors as whether the property is unavailable because it is presently occupied by a long-term lessee, whether it is banned for adult use because of a clause in a master lease, and whether the owners refuse to rent to adult establishments, despite rejection of these very arguments by the Renton Court (see also, O’Malley v City of Syracuse, 813 F Supp 133, 147 [ND NY 1993] [areas designated for adult use may include sites currently occupied by other businesses]; City of Natl. City v Wiener, 3 Cal 4th 832, 12 Cal Rptr 2d 701, 711-712 [1992], cert denied 510 US 824 [1993] [local governments are not responsible for the business decisions of private individuals]). McLaughlin also claims that whether or not there are police patrols in the area equal to that of other commercial areas is a factor to be considered despite the lack of any authority for such criterion.
Other categories of land eliminated by McLaughlin are undeveloped land, waterfront property and parking lots. This arbitrary exclusion, rejected by the Renton Court, makes absolutely no sense since New York has a consistent history of commercial development of undeveloped land, parking lots and waterfront property (see, Schneider v City of Ramsey, 800 F Supp 815, 823 [Minn 1992] [adult use districts may include undeveloped sites], affd sub nom. Holmberg v City of Ramsey, 12 F3d 140 [8th Cir 1993], cert denied 513 US 810). Indeed, most of McLaughlin’s criticisms are at odds with controlling case law.
*394 Although 10 months have passed since McLaughlin states he obtained zoning maps maintained by the DCP, he claims that he cannot estimate the acreage size of the permissible zones because of lack of time. He also fails to offer his own number of potential relocation sites under either the City’s methodology or his own methodology to rebut the City’s calculation.
Plaintiffs’ challenge of the DCP calculation that the Amended Zoning Resolution will permit the operation of 500 adult establishments is also based upon the deposition testimony of Marilyn Mammano, DCP’s Director of Zoning and Urban Design, who was produced for deposition pursuant to court order. Although plaintiffs characterize the Mammano deposition as proof that the DCP analysis is nothing more than a computerized claim and that no one from the City has inspected any of the claimed alternative sites, review of the transcript and reference to the record reveals otherwise. Mammano testified that she supervised the staff members who prepared the calculation which was based on maps prepared by the DCP. The maps showed the permissible areas and "sensitive receptors” such as schools and churches as well as properties unlikely for commercial development. Using the maps, and excluding encumbered areas and the sensitive receptors, and allowing for the appropriate 500-foot separation zone, DCP staff members used a measuring device to estimate a citywide total of 500 potential sites for adult establishments. Mammano stated her measurements were conservative and that they were accurate to within plus or minus 10%. The maps were made from tax assessment data and measured the 500-foot separation conservatively from the lot line rather than the facility on the lot. Although plaintiffs challenge this analysis because DCP failed to identify specific available sites, Mammano’s testimony established that the City’s calculation was not site specific, but an estimate of the number of potential sites in the permissible areas under the Amended Zoning Resolution. The record also established that DCP staff members, many assigned to borough offices, were familiar with and had visited the areas of the permissible zones through their work at DCP and that Mammano herself was familiar with certain boroughs. Although counsel for the New York Civil Liberties Union represented at the Mammano deposition that she had engaged an expert to verify the City’s method of and procedure for their calculations, the record does not contain any such expert affidavit.
Moreover, there is not a scintilla of evidence in the record to show that any of the affected owners have made any attempt *395 to find or negotiate for alternative sites. One would expect that during the 10 months since the passage of the Amended Zoning Resolution affected owners would investigate specific sites or engage commercial real estate brokers to assist them in locating such sites. Despite the plethora of generalized and conclusory allegations made by plaintiffs, the record is utterly devoid of a single action taken by a single affected owner or operator of an adult establishment to negotiate for alternative space. Nor is there any submission from any local commercial real estate broker familiar with the local commercial real estate market verifying the alleged lack of availability.
Plaintiffs’ challenge is based purely upon speculation and analyses based on criteria rejected by Renton (supra). By contrast the City has demonstrated an awareness of its constitutional obligation to make adequate provisions for adult establishments while simultaneously dealing with the secondary effects created by them. A party opposing summary judgment must come forward with evidentiary proof. Merely alleging that the opposing party’s evidence in support of the motion is inaccurate, incredible or in dispute will not suffice (Bachrach v Farbenfabriken Bayer AG., 36 NY2d 696 [1975]; Downey v General Foods Corp., 31 NY2d 56, 62 [1972]). Moreover, plaintiffs’ claim that additional discovery is needed so as to defeat the City’s motions for summary judgment is unavailing in view of the present administrative record that this court finds to be thorough, extensive and comprehensive (Frierson v Concourse Plaza Assocs., 189 AD2d 609, 610 [1st Dept 1993]; see, Reilly & Co. v Rockefeller Ctr. Mgt. Corp., 223 AD2d 477 [1st Dept 1996]).
The cases relied upon by plaintiffs, Topanga Press v City of Los Angeles (989 F2d 1524 [9th Cir 1993], cert denied 511 US 1030 [1994]) and Islip (supra), do not suggest otherwise. Rather, they reiterate that the key is whether the challenged Amended Zoning Resolution allows for the operation of at least as many adult establishments as existed before enactment. In Topanga, the principal case relied upon by plaintiffs, the Ninth Circuit affirmed the issuance of a preliminary injunction against the challenged adult use zoning regulation which restricted adult use establishments to certain areas with a 1,000-foot separation requirement between adult uses. The real estate expert employed by those challenging the zoning regulations concluded that there were 120 potentially viable relocation sites. Since more than 102 adult businesses in Los Angeles would need to relocate, the Ninth Circuit found that, when al *396 lowance was made for a margin of error, there was a substantial risk that the zoning resolution would reduce the number of reasonable sites potentially available thereby resulting in a decline in the total number of adult establishments. This result supported the granting of a preliminary injunction. In Topanga, there was a nearly one-to-one ratio of available sites to relocating businesses. In this case, the ratio of available sites to relocating businesses is greater than three to one.
In Islip (supra), since the stipulated facts demonstrated that ample space was available for relocation there was ostensibly no need for our Court of Appeals to address the issue. Nonetheless, the Court indicated that had there been a claim that "if the ordinance is enforced the total number of adult bookstores will decline or that fewer potential customers will be able to conveniently patronize them”, it would be otherwise (Matter of Town of Islip v Caviglia, 73 NY2d, supra, at 560). On this record, no such threat exists. Even if the City’s estimate overstates the number of potentially viable relocation sites, there still remains ample space for more than the existing numbers of adult establishments.
Finally nothing in Renton (supra), Islip (supra) or any existing case law requires the City to identify specific sites that are actually available. Indeed, all that is required is that plaintiffs are afforded a reasonable opportunity to relocate (Renton v Playtime Theatres, 475 US, supra, at 54). Defendants have more than sufficiently demonstrated that the permissible areas are suitable for commercial enterprise and are large enough to accommodate adult establishments which must relocate. While plaintiffs have labored mightily to create issues of fact, none exist.
Neither the Federal nor New York State Constitution mandates that the City guarantee the existence of specific, economically feasible, readily available sites owned by persons willing and able to rent to adult establishments with available door-to-door public transportation for those persons seeking to patronize them. Moreover, the Amended Zoning Resolution carefully balances the interests of those who seek to eliminate the neighborhood blight caused by an overconcentration of adult establishments against an individual’s constitutional right to patronize adult establishments.
New York’s long history and tradition of fostering freedom of expression and tolerating ideas that some may find offensive is in no danger from the Amended Zoning Resolution for the City has silenced no message. Those seeking to patronize adult *397 establishments will be able to continue to beat a path to their doors. While x-rated businesses may no longer be located on every street corner and may no longer dominate the Times Square area, as long as the current demand for them exists their numbers will certainly not lessen.
It is true, however, as plaintiffs contend that instant availability to pornography on demand will be eliminated from some sections of the City. It is also true that those who seek to patronize adult establishments may be minimally inconvenienced by the need to travel a bit to satisfy their desires and that the owners and operators of certain adult establishments may sustain some economic hardship as a result of the Amended Zoning Resolution. As discussed above, none of those factors render the Amended Zoning Resolution constitutionally infirm (see, Young v American Mini Theatres, 427 US, supra, at 79 [Powell, J., concurring]).
Accordingly, the City’s motions for summary judgment are granted, and the plaintiffs’ motions for summary judgment are denied. The String fellow’s, Amsterdam Video and Hickerson actions are hereby dismissed, and the clerk is directed to enter judgments dismissing these actions. The court declares that the Amended Zoning Resolution does not violate plaintiffs’ rights of freedom of expression guaranteed under the State Constitution, and is, therefore, constitutional.

 [3] Contrary to plaintiffs’ assertion, the Amended Zoning Resolution is not unconstitutionally vague. In deciding whether an ordinance, such as the Amended Zoning Resolution, is vague, this court must consider whether the Amended Zoning Resolution is sufficiently definite so as to provide a person of ordinary intelligence with fair notice that his conduct is forbidden by the resolution (Town of Islip v Caviglia, 141 AD2d 148, 163 [2d Dept 1988], affd 73 NY2d 544, supra). Here, the core language of the Amended Zoning Resolution is sufficiently specific, detailed, and definite leaving no doubt as to whether a business falls within the definition of an adult establishment. Where a party’s actions are clearly within the reach of the Amended Zoning Resolution, this court will not "strain to imagine hypothetical situations where the application of a statute or ordinance would be unclear” (Town of Islip v Caviglia, 141 AD2d, supra, at 163).
Next, the Amended Zoning Resolution must set forth explicit standards for those who apply them to preclude arbitrary and discriminatory resolution (Town of Islip v Caviglia, 141 AD2d, supra, at 163). In that regard, the City must be allowed a reasonable opportunity to develop guidelines and standards in its enforcement efforts so as to narrowly tailor the Amended Zoning Resolution to affect only the category of uses that produce the unwanted negative effects (see, Young v American Mini Theatres, 427 US, supra, at 71). If a business is deemed an adult entertainment establishment within the meaning of the Amended Zoning Resolution, appropriate administrative and judicial redress may be pursued challenging the rationality of such designation.