OPINION OF THE COURT
Chief Judge Wachtler.
The District Attorney of Erie County seeks a court order closing a bookstore as a public nuisance (Public Health Law, art 23, tit II) because some patrons are using the premises to commit illegal sexual acts. The question presented is whether an order closing the bookstore, to curtail the illegal acts of customers, incidentally affects the store’s constitutional right to freedom of expression, so as to require the State to show that it is the only available means to abate the nuisance.
This is the second time this case has come before us. On the first appeal we held that such an order would have an incidental impact on the bookseller’s First Amendment rights and that the prosecutor had not demonstrated that closing the defendant’s store was the "least restrictive means” to abate the nuisanqe created by some of its customers (People ex rel. Arcara v Cloud Books, 65 NY2d 324). The Supreme Court reversed concluding that the bookseller’s First Amendment rights would not be implicated or sufficiently affected by an order aimed at curtailing the illegal conduct of some of the store’s patrons (see, Arcara v Cloud Books, 478 US —, 106 S Ct 3172). On remand from the Supreme Court we must now decide whether greater protections are afforded the bookseller *556 under the State Constitution’s guarantee of freedom of expression (NY Const, art I, § 8).*
The facts are fully set forth in our prior decision and the Supreme Court opinion. Briefly the case reaches us in the following posture. Cloud Books operates a store where it sells adult books and shows movies which are sexually explicit but not obscene. Certain patrons have used the premises for indecent and illegal sexual acts. The owner is aware of the activities but has done nothing to prevent them; however, there is no contention that the owner is criminally responsible.
The District Attorney is also aware of the illegal acts of the patrons, which were observed by an investigator from. his office, but has not arrested the offenders or had them criminally prosecuted. Neither has the prosecutor applied for an injunction to prevent the illegal acts from occurring on the premises in the future. Instead he has applied for an order closing the bookstore for a year under Public Health Law, article 23, title II, which is aimed at preventing public nuisances. The order, if granted, will not legally terminate or suspend the defendant’s business — it is free to move next door and continue its activities if space is available. The order will only close the offending building or premise where the patrons committed the illegal conduct. Thus during the year the order would be in effect, the place where the illegal acts occurred would be unhallowed ground, unusable by any person for any purpose.
The District Attorney urges that this scheme should not unduly interfere with the bookstore’s legitimate activities. On the other hand he argues, somewhat inconsistently, that it would effectively disrupt and prevent the illegal activities of the patrons and therefore, furthers an important governmental interest. The goal of preventing the illegal acts is concededly a legitimate State concern — only the means chosen is in issue. It would appear, without more, that closing the store *557 would be equally disruptive or ineffective with respect to the activities of both the bookstore and its customers. The primary question is whether it implicates the bookseller’s constitutional rights of free expression so as to require a balancing of the competing interests.
A divided Supreme Court held that the bookstore’s First Amendment rights were not affected because they were not sought to be affected. The majority in that court held that the object of the order is the customers’ illegal sexual activity which, it noted, "manifests absolutely no element of protected expression” (478 US, at p —, 106 S Ct. at p 3177). To the extent the order might have an effect on the defendant’s legitimate bookselling activities, it was deemed to be too remote to implicate First Amendment concerns. The "least restrictive means test” was held to be applicable only when the government’s action was triggered by and directly aimed at curtailing "conduct that has an expressive element”.
We, of course, are bound by Supreme Court decisions defining and limiting Federal constitutional rights but "in determining the scope and effect of the guarantees of fundamental rights of the individual in the Constitution of the State of New York, this court is bound to exercise its independent judgment and is not bound by a decision of the Supreme Court of the United States limiting the scope of similar guarantees in the Constitution of the United States” (People v Barber, 289 NY 378, 384; see also, People v P. J. Video, 68 NY2d 296). The Supreme Court’s role in construing the Federal Bill of Rights is to establish minimal standards for individual rights applicable throughout the Nation. The function of the comparable provisions of the State Constitution, if they are not to be considered purely redundant, is to supplement those rights to meet the needs and expectations of the particular State.
Freedom of expression in books, movies and the arts, generally, is one of those areas in which there is great diversity among the States. Thus it is an area in which the Supreme Court has displayed great reluctance to expand Federal constitutional protections, holding instead that this is a matter essentially governed by community standards (Miller v California, 413 US 15). However, New York has a long history and tradition of fostering freedom of expression, often tolerating and supporting works which in other States would be found offensive to the community (People v P. J. Video, supra). Thus, the minimal national standard established by the Supreme *558 Court for First Amendment rights cannot be considered dis-positive in determining the scope of this State’s constitutional guarantee of freedom of expression.
It is established in this State that the government may not impose a prior restraint on freedom of expression to silence an unpopular view, absent a showing on the record that such expression will immediately and irreparably create public injury (East Meadow Community Concerts Assn. v Board of Educ., 18 NY2d 129). It is also settled that when government regulation designed to carry out a legitimate and important State objective would incidentally burden free expression, the government’s action cannot be sustained unless the State can prove that it is no broader than needed to achieve its purpose (Matter of Nicholson v State Commn. on Judicial Conduct, 50 NY2d 597; People v Taub, 37 NY2d 530). Although these holdings were based essentially on First Amendment principles, they are equally applicable under the State Constitution, since "at the very least, the guarantee of freedom of expression set forth in our State Constitution is of no lesser vitality than that set forth in the Federal Constitution” (Bellanca v State Liq. Auth., 54 NY2d 228, 235).
The only remaining question is whether the State constitutional guarantee of freedom of expression is implicated by an order closing the defendant’s bookstore to prevent illegal acts by patrons. There can be no doubt that bookselling is a constitutionally protected activity or that closing a bookstore for a year may have a substantial impact on that activity. The prosecutor urges that this impact may be constitutionally ignored when, as here, the State’s purpose is not to interfere with the store’s legitimate bookselling activities but is aimed at preventing patrons from committing illegal acts having no expressive content. That, however, is just another way of saying that the impact of the State’s action is not direct but only incidental. Actions of this type are subject to lesser scrutiny than those directed at restraining free expression, but they cannot be said to have absolutely no constitutional implications. The crucial factor in determining whether State action affects freedom of expression is the impact of the action on the protected activity and not the nature of the activity which prompted the government to act. The test, in traditional terms, is not who is aimed at but who is hit.
Of course a bookstore cannot claim an exemption from statutes of general operation aimed at preventing nuisances or *559 hazards to the public health and safety. It is, however, entitled to special protection, and no undue burden is placed on the State by requiring it to prove that in seeking to close the store it has chosen a course no broader than necessary to accomplish its purpose. If other sanctions, such as arresting the offenders, or injunctive relief prove unavailing, then its burden would be met.
Finally, we note that not every government regulation of general application, having some impact on free expression, implicates constitutional guarantees. Arresting a newspaper reporter for a traffic violation is one example where the impact would not be constitutionally cognizable, as Justice O’Connor noted in her concurring opinion at the Supreme Court. But closing a bookstore for a year, as is required by this statute, cannot be said to have such a slight and indirect impact on free expression as to have no significance constitutionally.
Accordingly, on reargument following remand from the United States Supreme Court, the order of the Appellate Division should be modified to grant defendant partial summary judgment dismissing those portions of the second cause of action seeking an order directing the closing of the premises in question.
Judges Meyer, Simons, Kaye, Alexander, Titone and Hancock, Jr., concur.
On reargument following remand from the United States Supreme Court, order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed. Questions certified answered in the affirmative.

 NY Constitution, article I, § 8 states: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.”