OPINION OF THE COURT
Titone, J.
This appeal concerns the validity of New York City’s Amended Zoning Resolution governing the location of adult entertainment establishments throughout the five boroughs. We conclude that on this record the Supreme Court correctly granted summary judgment declaring that the challenged ordinance does not violate plaintiffs’ constitutional rights of free expression.
I. Factual Background
The “adult” establishments at the center of this controversy offer various forms of sexual expression. These businesses include bookstores, theaters, stores dealing in videotaped material and places of live entertainment. In 1965, there were only nine such establishments in New York City. That figure has fluctuated over the past 30 years, but the last decade has experienced a steady growth in the industry, with sections of Manhattan and Queens showing the greatest development. By *391 1993, there were 177 adult establishments operating in New York City: 107 in Manhattan, 44 in Queens, 15 in Brooklyn, eight in the Bronx and three in Staten Island.
In September of 1993, the Department of City Planning (DCP) undertook an evaluation of the impact of such property uses on urban life. Published in September 1994, the DCP study was divided into two parts. First, the DCP examined similar studies conducted in nine other localities: Islip, New York; Los Angeles, California; Indianapolis, Indiana; Whittier, California; Austin, Texas; Phoenix', Arizona; Manatee County, Florida; New Hanover County, North Carolina; and the State of Minnesota. The DCP found evidence in these reports that adult businesses often have such negative secondary impacts as increased crime rates, depreciated property values and deteriorated community character.
The DCP also sought to identify the specific adverse secondary effects caused by adult establishments in New York City itself. To accomplish that goal, the DCP both conducted its own independent analysis of six selected areas in the City and examined other earlier studies of the City’s adult uses. Among the other materials examined were a 1977 report by the City Planning Commission (CPC); a 1983 Annual Report of the Mayor’s Office of Midtown Enforcement; a 1993 study conducted by the Chelsea Action Coalition and Manhattan Community Board 4; testimony at an October 1993 public hearing before the Task Force on the Regulation of Sex-Related Businesses; an April 1994 Times Square Business Improvement District (TSBID) study; and a 1993 survey compiling media accounts and complaint correspondence to City agencies.
The DCP’s independent study confirmed that the number of adult establishments in the City had increased considerably in recent years. The DCP further found that as adult uses proliferated, they tended to cluster. In Manhattan, for example, adult businesses were concentrated in central locations such as the Times Square area. In the other boroughs, such businesses lined major vehicular routes such as Queens Boulevard in Queens and Third Avenue in Brooklyn. Additionally, the vast majority of adult establishments were located in zoning districts that permitted residential development.
Based on the material before it, the DCP determined that there were significant adverse impacts attributable to adult enterprises in the City, including downward pressure on property values and increased crime rate in areas where adult uses *392 are most concentrated. A pivotal finding of the DCP was that a large majority of surveyed business and community organizations believe that their neighborhoods are adversely affected by the presence of adult uses and that this perception itself leads to disinvestment and a marked decline in economic and pedestrian activity.
II. The Challenged Ordinance
The Zoning Resolution of the City of New York, adopted on December 15, 1960, regulates commercial establishments in the City. Historically, the Resolution did not distinguish between adult establishments and other commercial ventures. Like other businesses, adult enterprises simply had to satisfy the requirements for the particular “use group” into which they were classified. Consequently, adult uses were permitted in most of the City’s commercial and manufacturing districts, which frequently also allowed residential development or were mapped close to residential districts.
Prompted by the findings and final recommendation of the DCP study that adult establishments should be regulated differently from other commercial establishments because of their unique negative effects, the CPC directed the DCP in November of 1994 to draft a set of adult-use zoning restrictions. Concomitantly, the City Council imposed a one-year moratorium on the creation or enlargement of adult-use establishments.
On March 21, 1995, the DCP and the City Council Land Use Committee jointly sought to amend the Zoning Resolution and establish a permanent and comprehensive set of regulations governing adult uses. Over the next several months, the City’s 59 community boards, five borough boards and borough presidents, the CPC and the City Council reviewed the proposed amendments and conducted public hearings. On September 18, 1995, the CPC approved the proposed amendments, noting that they were “an appropriate and necessary response to the adverse secondary effects stemming from adult establishments” and that they nonetheless continue “to provide ample opportunity for adult establishments to locate and operate throughout New York City.” After further public hearings and debate, the City Council gave final approval to Text Amendment N 950384 ZRY on October 25, 1995.
As adopted by the City Council, the amendments are applicable to any “adult establishment,” defined as those commercial enterprises in which a “substantial portion” of the premises are used as an “adult book store,” an “adult eating or drinking *393 establishment,” an “adult theater” or “other adult commercial establishment” (Amended Zoning Resolution § 12-10). Covered facilities are those within the foregoing four categories that “regularly feature” or devote a “substantial portion” of their stock-in-trade to entertainment or material that is “characterized by an emphasis on” “specified anatomical areas” or “specified sexual activities” (id.). “Adult eating or drinking establishments,” “adult theaters” and “other adult commercial establishments” are covered only if they exclude minors because of their age (id.).
The amendments to the zoning code include an array of site limitations and anti clustering provisions. Under provisions that predate the amendments, new commercial establishments, including new adult establishments, are barred from the City’s residential zones. Under the amendments, adult establishments, new and old, are now also barred from certain districts that are zoned for manufacturing and commercial use but also permit residential development. The regulated uses are permitted in all other manufacturing districts and in all high-density, general commercial districts (Amended Zoning Resolution § 32-01 [a]; § 42-01 [a]).
Within those districts where adult uses are authorized, the adult establishment must be located at least 500 feet from schools, houses of worship, day care centers, other adult uses and zoning districts where new residential development is allowed (Amended Zoning Resolution § 32-01 jb]; § 42-01 [b]). In addition, no more than one adult establishment may be located on a single zoning lot, and these establishments cannot exceed 10,000 square feet of usable floor area and cellar space (Amended Zoning Resolution § 32-01 [d], [e]; § 42-01 [d], [e]). The amendments also impose restraints on the size, placement and illumination of accessory business signs (Amended Zoning Resolution §§ 32-69, 42-55).
Any adult establishment operating in a prohibited location must either conform or terminate its business within one year of the amendments’ effective date (Amended Zoning Resolution §§ 52-77, 52-734). An exception to this termination requirement is available for existing businesses which are noncompliant only because (1) their area exceeds 10,000 square feet, (2) they are located on a zoning lot with another adult use, or (3) they are situated less than 500 feet from another adult establishment (Amended Zoning Resolution § 32-01 [f]; § 42-01 [f]). Another narrow exception is made for otherwise conforming adult uses that fall out of compliance because of the *394 subsequent siting of a school or house of worship within 500 feet of their boundaries (Amended Zoning Resolution § 32-01 [b]; § 42-01 [b]). Lastly; adult establishments faced with the one-year termination deadline can apply for an extension to the Board of Standards and Appeals, which may permit the applicant to remain open for a limited time to amortize any substantial and unrecovered costs associated with the adult portion of the establishment (Amended Zoning Resolution § 72-40).
III. Procedural History
On February 27, 1996, the Amsterdam, Video plaintiffs, consisting of more than 100 owners and operators of adult establishments in the City, and the Hickerson plaintiffs, consisting of four patrons of such establishments, commenced actions in Supreme Court, New York County, against the City and related officials. Plaintiffs alleged that the Amended Zoning Resolution deprived them of their right to free expression protected by article I, § 8 of the New York State Constitution and the First Amendment to the United States Constitution. Plaintiffs sought relief in the form of a judgment declaring the zoning amendments unconstitutional and enjoining their enforcement.
Defendants removed the case to the United States District Court for the Southern District of New York, but on plaintiffs’ application the court remanded plaintiffs’ causes of action grounded in the State Constitution, retaining jurisdiction over the Federal claims (932 F Supp 550). Subsequently, Stringfellow’s, a cabaret featuring topless dancers, separately challenged the constitutionality of the amendments and sought injunctive relief. Supreme Court then granted the intervention motions of TSBID, the Center for Community Interest, and 45 other community groups, business organizations and local elected officials and consolidated the actions for hearing.
On August 26, 1996, defendants moved for summary judgment. The Amsterdam Video and String fellow’s plaintiffs cross-moved for summary judgment; the Hickerson plaintiffs opposed defendants’ motions but declined to cross-move for summary judgment on the theory that the case involved material factual disputes warranting a trial. Before issuing its decision, Supreme Court ordered additional discovery, in particular directing defendants to answer interrogatories served by the Hickerson plaintiffs, to provide maps to demonstrate the areas where adult uses would be permitted when encumbered areas *395 were eliminated, and to produce for a deposition a person familiar with the DCP’s calculation of the total number of alternative sites that would be available to relocated adult establishments under the amendments. A voluminous record of pleadings, affidavits, exhibits and briefs totaling more than 10,000 pages was before the court on the various summary judgment motions.
On October 23, 1996, Supreme Court granted defendants’ motions for summary judgment and declared that “the Amended Zoning Resolution does not violate plaintiffs’ rights of freedom of expression guaranteed under the State Constitution, and is, therefore, constitutional” (171 Misc 2d 376, 397). Applying the test articulated by this Court in Matter of Town of Islip v Caviglia (73 NY2d 544, 558-559), Supreme Court first concluded that the amendments were content neutral. The court found in the City’s planning studies sufficient evidence of adverse secondary effects to support use of its zoning authority to address a serious neighborhood problem. Additionally, the court held that the amendments were no broader than necessary to achieve their stated purpose, with zoning being the most appropriate response to address existing and anticipated future problems. Further, in the court’s view, defendants had sufficiently demonstrated that the number of potential relocation sites under the Amended Zoning Resolution was more than adequate to accommodate the existing number of businesses. Plaintiffs’ claim of a lack of available alternative sites, in contrast, was speculative and rested on discredited theories. Thus, the court concluded, no issues of material fact existed requiring a trial. The Appellate Division unanimously affirmed (241 AD2d 360) and plaintiffs took an appeal as of right pursuant to CPLR 5601 (b) (l).[1]
IV. Analysis
This Court has long recognized the considerable authority of municipalities to implement zoning plans and programs to meet the increasing encroachments of urbanization on the quality of their residents’ lives (see, e.g., Asian Ams. for Equality v Koch, 72 NY2d 121; Matter of Harbison v City of Buffalo, 4 NY2d 553). Because they are legislative enactments, these land-use regulations generally enjoy a strong presumption of *396 constitutionality as valid exercises of the State’s police power to advance the public health, safety and welfare (see, McMinn v Town of Oyster Bay, 66 NY2d 544, 548-549; Udell v Haas, 21 NY2d 463, 469-470). Thus, even if the validity of a provision is “fairly debatable,” the municipality’s judgment as to its necessity must control (Matter of Town of Bedford v Village of Mount Kisco, 33 NY2d 178, 186).
Municipal zoning authority is not, however, completely unfettered. Ordinances such as the one challenged here that aim to curb “adult” uses implicate speech or conduct that is protected by the First Amendment (see, e.g., Schad v Mount Ephraim, 452 US 61, 65; Miller v California, 413 US 15, 24; Joseph Burstyn, Inc. v Wilson, 343 US 495, 502-503) and by article I, § 8 of the New York State Constitution.[2] Consequently, in weighing the validity of such zoning regulations, courts must consider the intertwined constitutional values of free expression.
In this State, the proper balance between community needs and free expression under our Constitution has been delineated in Matter of Town of Islip v Caviglia (73 NY2d 544, supra). At issue in Islip was a zoning ordinance that confined adult uses to industrially zoned areas and prohibited them from locating within 500 feet of a number of certain sensitive receptors or within one-half mile of each other. The ordinance had been prompted by studies of conditions locally and elsewhere which demonstrated the harmful impact of adult businesses on the surrounding community. We concluded that the ordinance satisfied both Federal constitutional standards (see, Renton v Playtime Theatres, 475 US 41) and the distinct protections afforded by our State Constitution. In so ruling, the Court considered whether the “predominant purpose” of the challenged ordinance was to ameliorate the negative secondary effects of adult uses rather than to suppress their content, whether the ordinance was “narrowly tailored to affect only those uses shown to produce the unwanted secondary effects” and whether it provided adequate alternative locations for adult businesses within the Town (73 NY2d, at 552-555, citing Renton v Playtime Theatres, 475 US 41, supra; Young v American Mini Theatres, 427 US 50). With respect to the State constitutional claims in Islip, the Court considered whether *397 the Town’s ordinance was “justified by concerns unrelated to speech,” whether it was “ ‘no broader than needed to achieve its purpose’ ” under the State constitutional principles set forth in People ex rel. Arcara v Cloud Books (68 NY2d 553) and, finally, whether “if the ordinance [were] enforced the total number of adult bookstores w[ould] decline or * * * fewer potential customers w[ould] be able to conveniently patronize them” (73 NY2d, at 557-560). It is against the template of Islip, that we measure plaintiffs’ claims in these cases.
A. The Ordinance’s Purpose Is Unrelated to Speech
The threshold issue here is whether the City’s zoning amendments are purposefully directed at controlling the content of the message conveyed through adult businesses or are instead aimed at an entirely separate societal goal. The Federal constitutional analysis requires examination of the ordinance’s “predominant purpose” (see, Renton v Playtime Theatres, supra), while the State constitutional inquiry focuses on whether there has been “a purposeful attempt to regulate speech” (Matter of Town of Islip v Caviglia, supra, at 557). In the context of these facts, however, the difference in verbiage does not significantly affect the outcome, since it is apparent from the amendments’ legislative history that ameliorating the negative social consequences of proliferating adult uses was the City’s only goal.
Before enacting the Resolution, the City Council assembled an extensive legislative record connecting adult establishments and negative secondary effects, including numerous studies on the effects of adult establishments both within and without New York City. One of these studies, prepared by the TSBID, focused on the impact of adult uses on property values and the incidence of crime in the Times Square area, in the heart of Manhattan. The TSBID identified four study blocks (those containing at least one adult enterprise) and four neighboring control blocks (those with no sex-related establishments), and then compared those data with similar statistics for the District as a whole, the wider Times Square area, all of Manhattan, and all of New York City. The data included crime statistics, property valuations and 53 formal interviews with business and real estate enterprises.
The study concluded that “the rate of increase of the total actual assessed values of the Eighth Avenue Study Blocks was less than the rate of increase for the Control Blocks along Ninth Avenue. To a lesser extent, the rate of increase of the actual *398 total assessed, value of the 42nd Street Study Block is less than that of the 42nd Street Control Block.” It also determined that “[w]ithin the study blocks, non-adult businesses with adult establishments nearby showed a deflated rate of property value growth, compared to the adult establishments themselves which increased in value at a higher rate.” Similarly, the underlying data showed a correlation between a concentration of adult establishments and increased crime. Over the five years preceding the study, for example, police statistics showed that there was an estimated 54% decrease in crime in the Times Square area, a decrease which was paralleled by a decrease in adult establishments. The study also found significant “patterns,” notably that there were many more criminal complaints on the study blocks than the control blocks and that the heaviest incidence of prostitution arrests occurred in the three block study area of dense concentration of adult establishments.
The Chelsea Action Coalition and Manhattan Community Board 4 prepared a second study of the effects that sex-related businesses have on other businesses in the Chelsea section of Manhattan. The study incorporated a survey of 100 Chelsea businesses located near triple-X video stores and peep shows in the neighborhood. A majority of those surveyed indicated that adult uses had a negative impact on their businesses and on the economic viability of the community as a whole.
The DCP independently surveyed six study and control areas — two in Manhattan, and one in each of the remaining boroughs. More than 80% of the real estate brokers responding to the survey reported that an adult establishment tends to depress the market value of property within 500 feet; similarly, community organizations overwhelmingly reported their perceptions that adult businesses negatively affect the community. Although the DCP acknowledged that its analysis of the hard data regarding the relationship between adult uses and urban ills did not yield conclusive results, a reading of its report as a whole indicates that the negative perception of adult enterprises held by the business community and the public itself results in disinvestment, with the concomitant deterioration in the social and economic well-being of the surrounding area.
Finally, the City additionally reviewed conclusions reached by city councils and town boards throughout the country. A 1984 study conducted for the City of Indianapolis, for example, found higher crime rates in areas containing at least one adult *399 establishment than in similar areas without adult uses. The Indianapolis study included a nationwide survey of real estate appraisers. A large majority of the appraisers indicated that, in their professional opinions, an adult bookstore would have a negative effect on the value of both residential and commercial properties located within a one block radius of the store. Still another example was a 1997 Los Angeles study that included a survey of real estate professionals and businesses. The survey indicated that a concentration of adult establishments adversely affected the value of surrounding commercial and residential property, made it more difficult to rent office space and retain commercial tenants in the area, and made it harder for area businesses to attract and retain customers.
In view of the legislative record upon which the City Council rested its decision to regulate adult uses, we agree with the courts below that enactment of the Amended Zoning Resolution was not an impermissible attempt to regulate the content of expression but rather was aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose (see, Matter of Town of Islip v Caviglia, supra). Plaintiffs’ reliance on isolated comments from several City Council members and other City officials as evidence of an alleged improper motive to eradicate this form of expression is unavailing. A similar claim was rejected in Islip, where we recognized that courts will not “invalidate a municipal zoning ordinance simply because one or more legislators sought to suppress protected expression * * *. [I]t is the motive of the Legislature, not individual legislators, that is controlling” (id., at 552, n 2).
Nor is it significant that definitions of adult uses in the Amended Zoning Resolution are based in part on the content of the entertainment offered rather than exclusively on the age of the businesses’ clientele (cf., Matter of Town of Islip v Caviglia, supra, at 557). The test under both Islip and Renton is not whether the regulated establishments are defined without reference to content but whether the ordinance’s goal is unrelated to suppressing that content (73 NY2d, at 557; 475 US, at 44, 47-50; see also, Young v American Mini Theatres, supra, at 52-54, 70-71 [plurality opn]). That test is plainly met here.
Plaintiffs’ complaints about the sufficiency of the evidence on which the City Council based its decision are unpersuasive. In Islip, we explicitly acknowledged the value of studies from other jurisdictions (73 NY2d, at 550, 553). Further, it is clear from the comments of the CPC upon its approval of the amendments that the appropriate municipal officials considered the *400 comparability and the reliability of the other jurisdictions’ studies and found them satisfactory on both counts. As the CPC noted, “while none of the other studies considers a municipality which duplicates New York City in terms of variety of neighborhoods and built conditions, * * * the findings of adverse secondary effects and the conditions found in these other studies are relevant to the different neighborhoods of New York City.” Plaintiffs have not offered any factual or legal basis to question that finding.
Moreover, the City did not rely exclusively on generic conclusions drawn from out-of-area studies but also conducted studies of its own. Contrary to plaintiffs’ contentions, the “nonempirical,” anecdotal evidence that comprised the bulk of the local studies does not render those studies worthless. In the proper context, anecdotal evidence and reported experience can be as telling as statistical data and can serve as a legitimate basis for finding negative secondary effects (see, e.g., Renton v Playtime Theatres, 475 US, at 44, supra; ILQ Invs. v City of Rochester, 25 F3d 1413, 1416-1417 [8th Cir], cert denied 513 US 1017), particularly where, as here, the nonempirical information is extensive and indicative of a clear relationship between adult uses and urban decay.
B. The Amendments Are No Broader Than Necessary
Based upon an extensive analysis of the impacts of such establishments in the City, the amendments represent a coherent regulatory scheme designed to attack the problems associated with adult establishments. By preventing adult businesses from locating in potential residential districts while allowing such establishments to locate in manufacturing and commercial districts, the amendments protect only those communities and community institutions that are most vulnerable to their adverse impacts.
It is now well recognized that municipalities can constitutionally bar adult establishments from, or within, a specified distance of residentially zoned areas and facilities in which families and children congregate (see, Renton v Playtime Theatres, supra, at 44; Young v American Mini Theatres, supra, at 52; Matter of Town of Islip v Caviglia, supra, at 549, 563). Moreover, zoning ordinances may be used to prohibit an adult business from operating within a specified distance of another in order to avoid the undesirable impacts associated with the clustering (see, Young v American Mini Theatres, supra, at 52; Matter of Town of Islip v Caviglia, supra, at 563).
*401 Relying on our State constitutional standard (see, People ex rel. Arcara v Cloud Books, supra, at 558), plaintiffs insist that defendants should have pursued less restrictive methods of addressing the problems caused by adult uses, such as more aggressive enforcement of existing penal and public nuisance laws, developing targeted signage requirements and limiting adult-use zoning restrictions to new establishments. However, the record here shows that the City Council reasonably determined that the listed alternatives would not adequately address problems it sought to ameliorate.
According to its report approving the proposed amendments, the CPC concluded that restricting only new adult uses “would have the effect of freezing certain locations and certain neighborhoods as the situs of adult establishments,” making the reversal of existing adult-use-related blight impossible. The CPC also looked at the possibility of sign regulations, but found, based on the studies before it, that such a narrow approach would not suffice to address such ills as reduced property values, economic stagnation, heightened crime and change in neighborhood character. As to the efficacy of more aggressive law enforcement measures, the CPC hearings revealed that such measures are generally only partially successful in stemming the criminal activity that often surrounds adult establishments.
Contrary to plaintiffs assertions in String fellow’s, the City was not obligated on this record to distinguish among different types of adult uses based on the social class of their clientele or the nature of the adult entertainment they provide. Indeed, such distinctions may well have themselves run afoul of constitutional prohibitions (see, id., at 558). Significantly, the CPC itself found that “all of the adult uses which would be covered by the proposed regulations have been shown to produce adverse secondary effects * * *. Nothing in the studies or in the public testimony justifies distinctive treatment of any adult use.” To the extent that certain individual establishments may legitimately claim that their facilities do not contribute to urban blight, their argument does not impair the constitutionality of the challenged legislation, since “[t]he validity of a statute * * * is not to be determined from its effect in a particular case, but upon its general purpose and its effect to that end” (City of Rochester v Gutberlett, 211 NY 309, 316; see also, ILQ Invs. v City of Rochester, supra, at 1418).
*402 C. Reasonable Alternative Avenues of Communication
To satisfy constitutional requirements, the City additionally must assure reasonable alternative avenues of communication (see, Renton v Playtime Theatres, supra, at 53-54). As this Court stated in Islip, there must be (1) “ample space available for adult uses after the rezoning” and (2) no showing by the challenger that enforcement of the ordinance will either substantially reduce the total number of adult outlets or significantly reduce the accessibility of those outlets to their potential patrons (73 NY2d, at 555, 560).
Relying on a formula derived from Renton v Playtime Theatres (supra), the Federal courts have generally concluded that reasonable alternative avenues of communication exist if there is sufficient land area open for use by adult businesses “ ‘in all stages of development from raw land to developed, industrial, warehouse, office and shopping space that is crisscrossed by freeways, highways and roads’ ” (id., at 53). Under Renton, land that is already occupied by commercial and manufacturing facilities and undeveloped land that is not for sale or lease is not to be automatically deemed unavailable. Further, any reduction in profitability caused by a forced relocation is not relevant to the availability inquiry (see, Renton v Playtime Theatres, supra, at 53; Woodall v City of El Paso, 49 F3d 1120, 1124-1125, cert denied 516 US 988; Grand Brittain v City of Amarillo, 27 F3d 1068, 1070; see also, Matter of Town of Islip v Caviglia, supra, at 555, 560 [areas of a municipality set aside for adult uses need not be prime locations]). Rather, the inquiry is limited to the physical and legal availability of alternative sites within the municipality’s borders and whether those sites are part of an actual business real estate market (see, Topanga Press v City of Los Angeles, 989 F2d 1524, 1530-1531, cert denied 511 US 1030; see also, Woodall v City of El Paso, supra; Alexander v City of Minneapolis, 928 F2d 278).
In determining whether proposed relocation sites are part of an actual business real estate market, the courts have considered such factors as their accessibility to the general public, the surrounding infrastructure, the pragmatic likelihood of their ever actually becoming available and, finally, whether the sites are suitable for “some generic commercial enterprise” (see, 989 F2d, at 1531). Notably, these considerations dovetail nicely with Islip’s requirement that there be “ample space available for adult uses after the rezoning” and no showing of a substantial reduction in the total number of adult outlets or the accessibility of those outlets to their potential patrons (73 NY2d, at 555, 560). With these consider *403 ations as a backdrop, we turn now to the specific facts and contentions presented here.
Plaintiffs assert, and the municipal defendants do not dispute, that the amendments’ enforcement will lead to the forced relocation of some 84% of the City’s 177 adult businesses. Given the extent of the dislocation, it is incumbent upon the municipal defendants to demonstrate that sufficient alternative receptor sites are available. The City has asserted that the space available for adult uses constitutes over 11% of the City’s total land area and about 4% when reduced by land encumbered by properties that are unlikely to be developed for commercial use. They further assert, based on maps prepared by City officials, that the amended zoning code leaves at least 500 potential sites for adult establishments to relocate and operate.
According to the City’s submissions, the amendments will allow adult businesses to remain in districts that permit a wide mix of commercial, retail, entertainment and manufacturing uses. All of the areas in Manhattan zoned for adult use and at least 80% of the land area in the other boroughs are within a 10-minute walk from a subway line or a major bus route. These supported allegations by the City satisfy its initial burden of showing that the space designated for adult uses is adequate to accommodate the 177 existing adult businesses.
Plaintiffs, in challenging defendants’ proof, rely heavily on an affidavit by Robert McLaughlin, a land-use planning and local government consultant who actually visited the sites the City identified as potential receptors. McLaughlin alleged that many of the sites are in truth unavailable because they currently house long-term occupants such as governmental and public utility facilities that are unlikely to yield to new tenants of any sort. Other sites, according to McLaughlin, lack the necessary infrastructure or lie on wetland property that is not suitable for commercial development. Overall, McLaughlin concluded, the City’s zoning plan does not allow for adequate alternative avenues for adult expression.
The McLaughlin affidavit, however, is not sufficient to raise a triable question of fact as to the availability of enough potential receptor sites. First, the affidavit’s utility is undercut by McLaughlin’s reliance on several assumptions that are inconsistent with controlling legal principles. McLaughlin, for example, took the position that “industrial areas” are generally unsuitable for generic commercial uses. In Islip, however, this *404 Court specifically approved a local zoning ordinance that restricted adult uses to an industrial zone (73 NY2d, at 548, 555; accord, Renton v Playtime Theatres, supra, at 53). Similarly, McLaughlin eliminated undeveloped land, waterfront property, warehouse areas and parking lots as unsuitable receptors, although both this Court and the Renton Court expressly recognized such areas as potentially available relocation sites.
The most significant flaw in McLaughlin’s affidavit, however, is the absence of any attempt to quantify his observations or to make concrete allegations as to precisely how many of the 500 potential receptor sites identified by defendants were, in his estimate, unavailable. To be sure, the affidavit lists a significant number of sites that are pragmatically unavailable because their current uses are so entrenched that they are unlikely to become part of the commercial real estate market in the foreseeable future. Included in this category are such diverse sites as those that house the northern half of Federal Plaza in Manhattan, the Clay Pit Ponds State Park Preserve in Staten Island, a New York City fire house in Brooklyn and a United Parcel Service facility in Queens. However, McLaughlin’s criticisms about various individual sites do not provide an adequate counter to defendants’ supported claim that within the available acreage as a whole there are more than enough receptor sites to accommodate the existing adult entertainment industry.
Even if the criticized sites are eliminated, the absence of any quantification in the McLaughlin affidavit makes it impossible to determine whether what remains of the 500 identified sites is insufficient to accommodate the 177 adult businesses that will have to relocate once the amendments are implemented. For example, despite McLaughlin’s observations that several tracts within the nonresidential zone along the far west side of Manhattan are physically or pragmatically unavailable, his affidavit does not contain the hard factual data necessary to establish that, with the elimination of these sites and with due consideration of the dispersal requirement, the City’s claim that Manhattan will accommodate some 75 adult uses represents a significant overestimation. Given this shortfall, the accuracy of the City’s over-all calculations was not called into serious question. Similarly, the McLaughlin affidavit did not provide a basis for inferring that the result of the new zoning controls would “restrict in any significant way those wishing to [patronize adult establishments] ” (Matter of Town of Islip v *405 Caviglia, supra, at 554). Thus, the McLaughlin affidavit is speculative and presents no impediment to summary judgment (see, Romano v Stanley, 90 NY2d 444, 451-452).
D. Plaintiffs’ Remaining Claims
The Amsterdam Video and Stringfellow’s plaintiffs argue that the amendments’ enforcement will lead to an unconstitutional taking because much of the substantial investments they have made in their businesses will be lost if they are required to relocate. They further contend that the one-year amortization provision in the ordinance (Zoning Resolution §§ 52-734, 52-77) is too short to give them an opportunity to recoup their investments. These arguments are unpersuasive, however, because they fail to take into account the effect of the statutory provisions for hardship extensions. Under these provisions, a nonconforming adult establishment may apply to the Board of Standards and Appeals for permission to continue to operate beyond the one-year amortization period set forth in the statute where it can show that it has made substantial expenditures related to the nonconformity, that such expenditures cannot be recouped within a year and that the requested extension is the minimum necessary to permit such recoupment (Zoning Resolution § 72-40). Having failed to seek relief under this provision, plaintiffs are not now in a position to complain that their constitutional due process rights have been violated (see, Matter of Parkview Assocs. v City of New York, 71 NY2d 274, cert denied 488 US 801; Town oflslip v Zalak, 165 AD2d 83, 95).
 Equally unavailing is plaintiffs contention that the amendments are unconstitutionally vague. As a threshold matter, the Hickerson plaintiffs, purportedly patrons of adult establishments, lack standing to assert these claims because the amendments do not directly regulate their conduct (see generally, Matter of Axelrod v Sobol, 78 NY2d 112, 115). With respect to the Amsterdam Video and Stringfellow’s plaintiffs’ vagueness claims, it should suffice to observe that the amendments’ definitional provisions are sufficiently specific to provide the public with clear and reasonable notice of the type of businesses that are covered. Indeed, the Federal courts have already upheld similar zoning provisions that regulate commercial facilities devoting a “substantial portion” of their businesses to adult entertainment (see, e.g., ILQ Invs. v City of Rochester, 25 F3d 1413, cert denied 513 US 1017, supra).
Finally, we are not persuaded by the Stringfellow’s plaintiffs discrete argument that the ordinance’s distance requirements *406 are too vague because they do not include a statement indicating the precise standard for measurement. To the extent that this aspect of the ordinance’s provisions leaves room for confusion, the problem is procedurally remediable through administrative application and rule making. Notably, there is no indication on the present record that the City’s enforcement of the distance rules will be arbitrary or uneven.
V. Conclusion
The City’s effort to address the negative secondary effects of adult establishments is not constitutionally objectionable under any of the standards set forth by the United States Supreme Court in Renton v Playtime Theatres (supra) or by this Court in Matter of Town of Islip v Caviglia (supra). Accordingly, in each case the order of the Appellate Division should be affirmed, with costs.
Judges Bellacosa, Smith, Levine, Ciparick and Wesley concur; Chief Judge Kaye taking no part.
In each case: Order affirmed, with costs.

. Enforcement of the Amended Zoning Resolution was stayed pursuant to an Appellate Division order dated October 24, 1996 and a subsequent agreement among the parties. On September 23, 1997, this Court denied defendants’ request for a vacatur of the stay (90 NY2d 933).

. Article I, § 8 provides in relevant part: “Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”