OPINION OF THE COURT
Stephen G. Crane, J.
Plaintiffs in each of these actions move for preliminary injunctive relief pursuant to Administrative Code of the City of New York §§ 7-707 and 26-120 and CPLR article 63. The motions are consolidated for decision herein.
The purpose of these actions is to abate the nuisances each establishment allegedly represents under the New York City Amended Zoning Resolution (Zoning Resolution) regulating adult establishments. It was established by stipulation that defendants Show World, Inc. (Show World), NRS XXX Video (NRS) and Les Hommes are each located within 500 feet of specified zoning districts. If they are adult establishments within the meaning of Zoning Resolution § 12-10, they would be in violation of Zoning Resolution § 32-01 (b). Thus, they would be susceptible to treatment as nuisances under the Nuisance Abatement Law (Administrative Code § 7-701 et seq.) because any building “wherein there exists or is occurring a violation of the zoning resolution” is defined as a public nuisance. (Administrative Code § 7-703 [k].)
In these actions for permanent injunctions (Administrative Code § 7-706), plaintiffs presented orders to show cause on July 31, 1998, in these and three other actions, seeking ex parte temporary closing orders (Administrative Code § 7-709) and temporary restraining orders (Administrative Code § 7-710) pending determination of these motions for preliminary injunctions (Administrative Code § 7-707). Of the six actions presented on July 31, 1998, three were subjected to temporary closing orders issued after hearings began concerning all six premises, and the court earlier granted preliminary injunctions in those actions.[1] Hearings were held on August 6, 7, 10, 11 and 14, 1998. The parties filed posthearing memoranda and reply memoranda, and they engaged in oral argument on August 25, 1998.
*814 With respect to these remaining three actions, the hearings delved into the history of the operations as adult establishments and into their efforts to abate or to conform to the Zoning Resolution by reconfiguring their space and reorganizing their stock. The issue that controls the decision of these motions for preliminary injunctions distills, very simply, to whether the defendants have succeeded in their abatement efforts. This, in turn, requires this court to construe the Zoning Resolution to determine what standards are applicable in defining an “adult establishment” as described in Zoning Resolution § 12-10: “An ‘adult establishment’ is a commercial establishment where a ‘substantial portion’ of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof [that carries on certain activities or stocks of reading or viewing material characterized by a defined emphasis].” For an adult book store, such as NRS and Les Hommes are alleged to include, this stock must constitute a “substantial portion” of its stock-in-trade. Other adult establishments must “regularly feature” (Zoning Resolution § 12-10) the specified performances, live or by some form of visual or photographic reproduction.
Zoning Resolution § 12-10 goes on to prescribe:
“For the purpose of determining whether a ‘substantial portion’ of an establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or combination thereof, the following factors shall be considered[:] (1) the amount of floor area and cellar space accessible to customers and allocated to such uses; and (2) the amount of floor area and cellar space accessible to customers and allocated to such uses as compared to the total floor area and cellar space accessible to customers in the establishment.
“For the purpose of determining whether a bookstore has a ‘substantial portion’ of its stock in materials defined in paragraphs (a) (1) or (a) (2) hereof, the following factors shall be considered: (1) the amount of such stock accessible to customers as compared to the total stock accessible to customers in the establishment; and (2) the amount of floor area and cellar space accessible to customers containing such stock; and (3) the amount of floor area and cellar space accessible to customers containing such stock as compared to the total floor area and cellar space accessible to customers in the establishment.” (Emphasis supplied.)
*815 Defendants argue that they are not adult establishments because less than 40% of their stock as a book store and less than 40% of the floor area accessible to customers in all three premises is devoted to adult uses as defined in Zoning Resolution § 12-10. Plaintiffs, on the other hand, contend that there is no mechanical ratio of 60:40 that determines whether an enterprise is an adult establishment and that the three premises at bar, even if they have complied with this ratio, can easily revert to adult uses in the nonadult portions. They urge that the types of changes made by Show World, NRS and Les Hommes are superficial and unreliable and that the court should look at all factors of the operations, including revenues and patronage, before determining the question of “substantial portion”.
We must, therefore, examine the legislative history bearing on the phrase “substantial portion” and look to other indications that were brought out during the hearings to determine how to interpret this legislative language. In doing this, the court keeps in mind that the plaintiffs shoulder the burden of proof. They have accepted a standard of clear and convincing evidence for this burden. (See, Colorado v New Mexico, 467 US 310, 316 [“an abiding conviction that the truth of its factual contentions are ‘highly probable’ ”]; Addington v Texas, 441 US 418, 423 [“(t)he standard serves to allocate the risk of error between litigants and to indicate the relative importance attached to the ultimate decision”]; supra, at 425 [an intermediate standard between preponderance and beyond a reasonable doubt].) The court is also mindful of the First Amendment implications of these motions and the need for heightened protection of the defendants’ rights to free expression. (Matter of Town of Islip v Caviglia, 73 NY2d 544, 556; see also, supra, at 566 [Titone, J., dissenting]; People ex rel. Arcara v Cloud Books, 68 NY2d 553, 558; cf., Ward v Rock Against Racism, 491 US 781, 791.)
In addition, the court needs to consider the effect of the plaintiffs’ posture in Federal court before United States District Judge Miriam Goldman Cedarbaum regarding the interpretation of this “substantial portion” language.
Legislative History
Judge Titone in String fellow’s of N. Y. v City of New York (91 NY2d 382, 391-392, 397-399), in upholding the constitutionality of the Zoning Resolution, discussed its genesis and the findings to which it was addressed. These included the impacts found to be attributable to adult enterprises “including *816 downward pressure on property values and increased crime rate in areas where adult uses are most concentrated.” (Supra, at 391-392.) Part of the background of this amendment to the Zoning Resolution was discussed by the City Planning Commission (CPC) in deciding the application of the Department of City Planning and the New York City Council Land Use Committee and approving the Amended Zoning Resolution on September 18, 1995 (which ultimately became effective Oct. 25, 1995).[2] As pertinent here the CPC expressed concern for the clarity of certain phrases in the Amended Zoning Resolution.
Focusing on the “substantial portion” phrase that concerns us at bar, the CPC recited the floor area formula above quoted from section 12-10 of the Amended Zoning Resolution. It then opined: “As a general guideline, the Commission believes that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied * * * and thus be an ‘adult establishment’ or ‘adult bookstore.’ However, there may be exceptions to this general guideline. A disproportionately large amount of adult materials, as compared to total stock, moved into a smaller amount of floor area should allow an establishment to be deemed an adult establishment. In addition, the Commission believes that 10,000 or more square feet of commercial space occupied by adult uses or adult materials is ‘substantial’ regardless of the overall size of an establishment. These factors and the approach make it clear that the regulations are not intended to cover general interest book or video stores with a section of adult materials that is modest in scale as compared to the overall size of the establishment.” (City Planning Commn Report on Adult Use Zoning Amendments, at 50-51 [Sept. 18, 1995].) The CPC went on to suggest that other factors “such as the nature or prominence of display of adult materials” (id., at 51) would invest in the enforcers an undesirable level of discretion.
The CPC was also concerned with the phrase “regularly features” in the definitions of adult eating or drinking establishment and adult theater. It clarified that the intent was not to cover performances or films displaying incidental nudity but, rather, to apply to emporia having “adult entertainment on a frequent, on-going basis” (id., at 52) as opposed to an occasional basis. It gave an example of the latter as a “monthly live performance or a nightly midnight showing at a *817 movie theater” (id., at 52). And, for eating or drinking establishments and theaters, it said that adult entertainment should be a principal form of entertainment or the principal purpose of the theater exhibiting the adult material.
Principles of Statutory Construction
It is noteworthy that Zoning Resolution § 12-10 specifies the factors that control the determination of “substantial portion” in ascertaining whether an enterprise is an adult establishment. These factors embrace the accessible floor area ratio and the ratio of adult to nonadult stock these defendants are relying on as the mathematical mantra by which to escape the definition of adult establishment.
The maxim expressio unius est exclusio alterius applies here. This principle of statutory interpretation requires a construction that excludes any factor in determining “substantial portion” not expressly set forth; it means that there is an inference that the drafters of this legislation intended that the other factors be omitted. (McKinney’s Cons Laws of NY, Book 1, Statutes § 240.) Related is the proposition that the failure of legislators to include a matter is indicative that its exclusion was intended. (Pajak v Pajak, 56 NY2d 394, 397; City of New York v New York Tel. Co., 108 AD2d 372, 375, appeal dismissed 65 NY2d 1052; McKinney’s Cons Laws of NY, Book 1, Statutes §74.)
In this context, the plaintiffs ask the court to apply the additional factors of permanence of conformity, comparative revenues from the adult and nonadult portions of each operation and the amount of patronage each attracts. Stated otherwise, they ask the court to abstain from a mechanical application of the floor area and stock-in-trade factors in section 12-10 and to ascertain the essence of each enterprise.
Instructions to Buildings Inspectors
The New York City Department of Buildings has issued Operations Policy and Procedure Notices (OPPN) Nos. 0498, 0598 and 0698 on July 22, 1998 and August 13, 1998. These are not administrative regulations but are intended to provide guidance to inspectors and others charged with enforcing the Zoning Resolution. The July 22 OPPNs guided the interpretation of “substantial portion” and “regularly feature”. Basically, they stated that if at least 40% of a “book store’s total stock accessible or available * * * for sale or rent to customers is comprised of adult materials”, then there would be a substan *818 tial portion of stock in adult materials. Further, if 10,000 or more square feet were occupied by adult materials, the • establishment would be deemed an adult book store regardless of its over-all size.
To determine the status of an adult eating or drinking establishment, theater or other commercial establishment, consideration should be given to the amount of floor area and cellar space accessible to customers allocated to adult use compared to the total accessible floor area and cellar space. If at least 40% is devoted to adult uses, the enterprise would be an adult establishment. And, again, if 10,000 or more square feet were devoted to adult purposes, this would indicate an adult establishment regardless of its over-all size. Finally, according to this OPPN, adult entertainment should be the principal form of entertainment at the establishment.
OPPN No. 0498 rather neatly conformed to the CPC interpretation of “substantial” quoted earlier in this opinion. However, on August 13, 1998, the Department of Buildings superseded No. 0498 with No. 0698. Now, adult establishment was treated differently. OPPN No. 0698 continues to decipher “substantial portion” in the context of a commercial establishment with two or more uses, at least one of which is not a book store, eating or drinking establishment, theater or other adult commercial establishment. In this mixed use context, the OPPN applies the 40% guideline to the area “accessible to customers allocated to adult use” as compared to total accessible floor area and cellar space. The OPPN recapitulates that “if a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an ‘other adult commercial establishment,’ has at least 40 percent of the floor and cellar area that is accessible to customers available for adult use, then a ‘substantial portion’ of the establishment is devoted to an adult use”.
OPPN No. 0698 concludes with a terse statement that the guidelines for a mixed use commercial establishment do not apply to a commercial establishment that is entirely an eating or drinking establishment, theater or other adult establishment or combination of the foregoing. This seems to create an unintended lapse in the guidelines because OPPN No. 0698 has superseded No. 0498 where guidelines for the latter were set forth; and nowhere else in No. 0698 is there found an interpretation for the pure adult use establishment described in the last sentence of OPPN No. 0698.
*819 Plaintiffs’ Posture in Federal Court
In Amsterdam Video v City of New York (96 Civ 2204), pending before District Court Judge Cedarbaum, the City embraced OPPN No. 0498 as adopting the CPC intent respecting the 40% formula to determine “substantial portion”. It is not disputed that on July 24, 1998, in that action, the Assistant Corporation Counsel appearing for the City of New York stated that a commercial enterprise allocating less than 40% of its accessible floor area to an adult use complies with the Zoning Resolution and that these guidelines should be read into the very text of the Zoning Resolution.
Facts
On oral argument of these motions after the testimony had closed plaintiffs conceded that the status of the three establishments considered here must be decided as of August 14 rather than as of July 31 when these actions commenced. Therefore, much of the testimony about visits between July 22 and July 31 would be immaterial. Indeed, the history of these establishments is not in issue. Each was a potpourri of pornography and would qualify as an adult establishment under the Zoning Resolution.
Plaintiffs ask the court to reject testimony on credibility grounds given by Neil Berzak, the architect for Show World and NRS. They also attack the credibility of Scott Wexler, Show World’s comptroller on the basis that he tried to characterize the female performers that used to appear at the Big Top Lounge and in the one-on-one booths as independent contractors rather than employees. Further, they suggest that William Pennington was hardly a knowledgeable witness for Les Hommes, and plaintiffs question why another more authoritative person could not have been called on behalf of that establishment. Finally, they ask that the court apply the interested witness doctrine to Cecil Fernando, an owner of NRS, and find him unworthy of reliance because of his testimonial attempt to cover for Mr. Berzak.
As to Berzak, his inconsistencies and errors or misrepresentations were collateral. Both sides have put into evidence his drawings or blueprints of Show World and both have used his diagram of NRS. Wexler I found credible; his stance respecting the female performers as independent contractors may have been unsuccessful for tax purposes, but the arrangement Show World had with them for rent on the booths gives him some support. While Fernando is, of course, interested in the *820 outcome of these proceedings, he is believable, and his possible cover-up for Mr. Berzak was plausible from the standpoint that Fernando was not on site at all times to be in a position to refute Berzak’s testimony that he, Berzak, did indeed come to the premises to take measurements. In any event, I credit Mr. Fernando’s testimony.
Show World
Plaintiffs contend that Show World on August 14, 1998 represented the combination of three previously separated establishments: Show World, Big Top Lounge and Fun Emporium, and that they should continue to be treated separately. After all, they sued separately in attacking the constitutionality of the Amended Zoning Resolution. These three are now internally combined, although there may be a charge to get from one to the other. Show World asserts that it took over the month-to-month lease by which Big Top Lounge had been operated until mid-July 1998 and it combined internal access to Fun Emporium with a door built pursuant to a permit issued by the Department of Buildings. Over 50 peep and related booths had been removed from various areas of the combined space. Show World has spent or sacrificed over $100,000 by August 14 in converting the enterprise to a nonadult establishment under the 60:40 rule.
Plaintiffs criticize Show World’s advertising campaign in the New York Post and New York Daily News as tailored to the hearings because Mr. Wexler admitted that if Show World had contracted for advertising for one year it would achieve a bargain rate. The court attaches no significance to the brevity of the advertising campaign for the very practical reason that a commitment for an entire year would be too risky in view of the pendency of this action and the unsettled state of the 60:40 rule.
As of August 14, 1998, the first and second mezzanine, though accessible to the public, are empty. The Big Top Lounge, now billed as the Big Top Theater, shows classic, i.e., old movies on TV monitors. It contains billiard tables and a dormant area formerly used as a stage in which a large screen monitor is placed. Otherwise, a small portion of the entrances at street level to Fun Emporium and Show World are devoted to the sale of nonadult merchandise such as luggage, baseball caps and “I Love New York” and “NYPD” t-shirts. Despite the *821 discrepancies in calculations of the square footage[3] the court finds the fact to be that approximately 18% of the combined Show World is devoted to adult uses. In any event, it finds that less than 40% under any calculation of this combined establishment is an adult establishment.
While Show World is negotiating with a known legitimate company to improve the mezzanines to present “virtual reality”, the court is not concerned, for purposes of the Amended Zoning Resolution, with what will be in Show World or any other establishment. The court is concerned with “substantial portion” and not “substantial use” and for all that was heard before me in these proceedings there could be a “virtual reality” that deals in the sexual expressions that run afoul of the Zoning Resolution. In such an event, the square footage devoted to this purpose will be added to the other square footage of Show World that contributes toward the 40% formula.
NRS
Plaintiffs have criticized the efforts of NRS to conform to the 60:40 formula. They suggest that the wall that separates the adult from the nonadult portions of the premises is easily moved. Yet, its two-by-fours are secured to the floor and walls, and NRS had to hire outside workers whose efforts to erect and later relocate this wall consumed many hours. The wall does not meet the ceiling and it is faced in pegboard. NRS did eliminate six peep booths at the rear of the store. It has devoted the front footage to nonadult tapes and the rear contains the adult offerings although there are additional adult tapes stored in the basement, yet, not accessible to patrons.
The nonadult front portion of NRS as of August 2, 1998 is at least two-thirds of the floor area accessible to patrons. The adult stock-in-trade of NRS consists of videotapes that are displayed only in the rear portion of the store and consists of less than 40% of the total stock of videotapes available to the public for sale or rent. That Mr. Fernando was unable to name the titles of the nonadult movies starring Harrison Ford or Mel Gibson neither diminishes his credibility nor undermines the proof of the ratio of nonadult to adult stock.
*822 Les Hommes
Here is an establishment catering to gay clientele on the Upper West Side. It has done business for 20 years at the same location. In the front or entry portion of this second floor premises, what was solely adult video offerings has now been diluted to include over 60% of nonadult videos. In the two small theaters beyond this display area, for access to which a $10 fee is paid, there are now shown videos or movies of men clothed in trunks wrestling. A paper sign at the turnstile to this area heralds this fact. On one occasion one of the theaters projected a video or movie of a clothed male dancer.
The peep booths, still in situ, were altered to tape the bill acceptors and power off and remove the cassettes from the multiselection VCRs. The expensive electrical devices that allowed for multi-selection of up to 30 different films in the booths were removed. These were replaced with a single monitor and VCR for each booth. Even after these changes, an inspector saw displayed in one of these booths a naked male on the floor of a wrestling ring.
The total square footage of floor area of Les Hommes is 1,191 square feet. The floor area of the booths is 270 square feet; the mini-theaters take up 560 square feet; 51 square feet represent a corridor area beyond the turnstile; 179 square feet are used for nonadult videos; a bin that contains the covers for adult videos consumes about six square feet; and 125 square feet contain the actual adult videotapes. If the mini-theaters are excluded from the adult use portion of the accessible premises, less than 40% of the floor area is devoted to adult use. Otherwise, Les Hommes would still be an adult establishment of mixed use because the court finds that the booths are still used for viewing adult material.
In addition, Les Hommes qualifies under the ratio for its stock of which approximately 70% is nonadult.
Discussion, Conclusions and Decision
In accordance with the principles of statutory construction discussed earlier, the court is constrained to construe the Zoning Resolution as imposing a ratio consideration as the singular factor in determining “substantial portion”. Indeed, the very term “portion” employed in section 12-10, rather than “substantial use”, forecloses consideration of the factors advocated by *823 plaintiffs — basically revenues and patronage.[4] This comports as well with the Department of Buildings’ interpretation of section 12-10 in its OPPNs.
The City argues that these are not laws or regulations and, therefore, the court is not bound by them. Defendants argue, however, that due process requires that these OPPNs be given consideration in making a determination of whether defendants are in compliance with the Zoning Resolution; after all, defendants have relied on these OPPNs in trying to conform to the Zoning Resolution.
Although defendants’ argument has merit, that does not translate into a mechanical application of the “60/40” rule. That is, just because an establishment devotes less than 40% of its square footage to adult entertainment, or less than 40% of its accessible stock is adult material, it automatically is deemed in compliance with the Zoning Resolution. The absurdity of this Pavlovian approach is demonstrated by the *824 example of a one-room establishment placing a flimsy screen across the room at the 40% mark and denoting the smaller area of the room as the portion devoted to adult entertainment. Defendants might argue that the Zoning Resolution contains no provisions as to how or in what manner an establishment is to “divide” itself and, therefore, they must take a mechanical approach to the application of the Zoning Resolution. As the above example demonstrates, however, this does not comport with the history or spirit of the Zoning Resolution and, in fact, makes a mockery of the legislation. That is why, as this court previously stated, as a court of equity it will apply common sense in analyzing the statutory factors and in interpreting the guidelines provided by the OPPNs to determine whether each of these establishments is in compliance with the Amended Zoning Resolution. This is what the CPC intended when it said there may be exceptions to the 40% guideline.
The defendants have asserted that they want to abate or comply with the Zoning Resolution by changing their businesses but that the Department of Buildings has failed to respond to their overtures. This is, indeed, unfortunate because, by first proceeding in court the plaintiffs are relying on the judicial branch of government to flesh out the concept of “substantial portion”. Yet, the administrative agency with the expertise is far better equipped to accomplish this objective; and its determinations would be subject to review under standards applicable to article 78 proceedings. Instead, the plaintiffs have undertaken a burden of clear and convincing evidence.
The plaintiffs argue, however, that even if the Department of Buildings had consulted or negotiated with defendants, there would be no reliability in the changes made by Show World, NRS and Les Hommes. What the plaintiffs want to avoid is recidivism or backsliding into future adult uses. They point to the decisions in Queens County after trial before my brother, Justice Steven Fisher. Judge Fisher provided, in permanent injunctions, for the presentation of plans that would meet the Zoning Resolution. (City of New York v Nickels, Sup Ct, Queens County, Aug. 14, 1998, index No. 016704/98; City of New York v Wiggles, Sup Ct, Queens County, Aug. 14, 1998, index No. 016705/98.) Defendants suggest that monitoring by frequent City inspections can avoid backsliding. Yet, the City cannot constantly place inspectors in these premises to ensure compliance. (City of New York v Dana, 165 Misc 2d 409, 416 [Sup Ct, NY County, Diamond, J.].)
*825 The plaintiffs also make the point that the operations of these three defendants does not alter the adverse impact on sensitive receptors and the downward influence they have on property values which the Amended Zoning Resolution was intended to overcome.
Defendants, on the other hand, insist that they want to conform and are doing their best to do so. They argue that it would be wrong to close their operations on speculation that they could recidivate. Indeed, they make the salient point that this could happen anywhere. Former nonadult establishments could easily increase the percentage of their stock in, for example, videotapes to over 40%, and the City inspectors certainly cannot monitor all such businesses.
The foregoing competing considerations must be reconciled in the context of plaintiffs’ burden of proof and in the context of constitutional constraints. As the Supreme Court of the United States wrote in Forsyth County v Nationalist Movement (505 US 123, 131), to provide against arbitrary application of Government regulations of the time, place and manner of speech, there must be narrow, objective and definite standards (citing Shuttlesworth v Birmingham, 394 US 147, 150-151).
Analysis must embrace the proposition that the Amended Zoning Resolution gave enterprises such as these defendants operate a choice “either conform or terminate”. (Stringfellow’s of N. Y. v City of New York, 91 NY2d 382, 393, supra.) Thus, the Zoning Resolution contemplates the very efforts that Show World, NRS and Les Hommes are making. If they have accomplished compliance, plaintiffs conceded that they may remain where they are. These three establishments, unlike Wiggles and Nickels that Judge Fisher’s judgments enjoined, are beyond the planning stage. They have implemented the changes, and Judge Fisher gave Wiggles and Nickels the chance to present plans to do the very same job — comply.
In terms of monitoring, this court heartily agrees with Judge Diamond in Dana (supra) that the City cannot monitor in perpetuity. But, Dana presented a vastly different situation. There, the New David Cinema promised the Department of Health that it would abate the nuisance of patrons engaging in illegal sex acts on the premises. Unfortunately, the Cinema was incapable of sufficient monitoring to bring about an abatement, and the court rejected, as an alternative to closure, the notion that the City could police the activities. This is quite dissimilar to the proposition that once abatement has occurred it is not a viable alternative to permit periodic inspections as the alternative to closure.
*826 Finally, as to the plaintiffs’ concerns that the abated status of these establishments still depresses property values and impacts sensitive receptors, the court can only observe that the Amended Zoning Resolution was drafted in that manner. The court can only implement the will of the public as it is actually expressed in the legislation it has adopted. If that legislation, in order to meet constitutional requirements, falls short in some measure of curing all the ills that precipitated its passage, the court is not a super-legislature to make new law to effect the cure.[5]
The court has concluded, then, that, because of the substantiality of the changes made to NRS and Show World and the expenses and costs NRS, Show World and Les Hommes[6] have experienced in “doing their best to comply’, the plaintiffs have failed to establish by clear and convincing evidence that these establishments, as currently configured, fall within the definition of “adult establishment” under Zoning Resolution § 12-10. Les Hommes comes dangerously close due to the use of its mini-theaters which could change overnight. But the exhibit of wrestling videos has been confirmed by City inspectors. Yet, it cannot be said for this potential of recidivism alone that plaintiffs have sustained their burden against Les Hommes.
Accordingly, it is ordered that the motion for a preliminary injunction in each of the above-captioned actions be denied; and it is further ordered that the parties promptly contact the court for a trial date for each of these actions and for the three other actions in which preliminary injunctions have been granted.

. Justice Richard Wallach stayed enforcement of that portion of the preliminary injunction concerning the Harmony Theater at West 22nd Street that directed a closure of the premises pending trial of that action; but, the owners of those premises have agreed to remain closed pending final determination.

. Because of stays and stipulated extensions of stays, enforcement of the Amended Zoning Resolution could not begin until July 22, 1998.

. Videotapes are sold in the combined Show World of both adult and nonadult varieties; but, no estimate of the ratio of this stock was given. Under OPPN No. 0698, the ratio of this stock would not be a consideration. Only floor and cellar space would guide a determination of “substantial portion”.

. Plaintiffs say their position here is not inconsistent with their representations in Federal court. They argue that these other factors besides the “60/40” rule need to be considered. This is, indeed, a different position than the one they propounded in Federal court.
Defendants argue that the City should be judicially estopped from retreating from the position taken in Federal court and from erecting a moving target for complying with the Zoning Resolution. Defendants state that they relied on the City’s interpretation of the Zoning Resolution and the OPPNs in their efforts to become compliant with the law. In response, the City contends that estoppel is not available against it. The cases on which the City relies, however, do not involve judicial estoppel: Matter of Parkview Assocs. v City of New York (71 NY2d 274 [equitable estoppel], appeal dismissed, cert denied 488 US 801 [1988]); Advanced Refractory Technologies v Power Auth. (81 NY2d 670 [promissory estoppel]); Matter of New York State Med. Transporters Assn. v Perales (77 NY2d 126 [equitable estoppel]); Matter of Hamptons Hosp. & Med. Ctr. v Moore (52 NY2d 88 [equitable estoppel]); Matter of Daleview Nursing Home v Axelrod (62 NY2d 30 [equitable estoppel]); and Chemical Bank v City of Jamestown (122 AD2d 530 [promissory estoppel does not arise from mere expression of opinion in correspondence from governmental agent], lv denied 68 NY2d 608).
Under the doctrine of judicial estoppel, or estoppel against inconsistent positions, a party is precluded from “ ‘inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding or a prior proceeding” ” (Inter-Power of N. Y. v Niagara Mohawk Power Corp., 208 AD2d 1073, 1075, quoting Shepardson v Town of Schodack, 195 AD2d 630, 632, affd 83 NY2d 894). The City does not cite any cases for the proposition that judicial estoppel, as opposed to equitable estoppel, may not be imposed against the government. Given the position maintained by the City in the Federal court proceedings, it is estopped from changing its position regarding the criteria to be considered in determining whether a business constitutes an adult establishment or adult book store. (See, Shepardson v Town of Schodack, supra.)

. While this court is committed to discerning and implementing, as best it can, the will of the people expressed in its legislation, it must also be true to its oath to uphold the NY Constitution. “To respond to public opinion of the moment or to capitulate to popular emotions * * * defeats the ends of justice” (People v Goetz, 131 Misc 2d 1, 2, affd for reasons stated by Crane, J., 116 AD2d 316, revd on other grounds 68 NY2d 96).

. Les Hommes has dismantled an expensive device that used to allow selections from upwards of 30 adult videos in each booth. Whether that device was discarded or can be restored has not been revealed. This is unimportant, however, since the court has counted the floor area of these booths as still in the adult column. Les Hommes has made few, if any, other physical changes to its premises as opposed to its stock.